STATE, EX REL. WILLIAM T. THOMPSON, ATTORNEY GENERAL, RELATOR, V. HUDSON J. WINNETT ET AL., RESPONDENTS.

FILED FEBRUARY 21, 1907. No. 15,054.

1. **Constitution: AMENDMENTS.** The self-imposed limitations on the power of the people to amend their fundamental law should not be so construed as to defeat the will of the people, plainly expressed, on account of a slight and unimportant failure to comply literally with such limitations, if the requirements are substantially observed.

2. ———: ———: PUBLICATION. The constitution requires that, when proposed amendments thereto are submitted to a vote of the people, said proposed amendments shall be "published once each week in at least one newspaper in each county, where a newspaper is published, for three months immediately preceding the next election of senators and representatives, at which election the same shall be submitted to the electors for approval or

rejection." Where there is a substantial compliance with this requirement, the fact that the publication was made for one week less than the required time in one county of the state will not invalidate the amendment.

3. ———: ———: MANNER OF VOTING. The manner of voting upon a constitutional amendment and the general conduct of the election are for the legislature to provide, subject to the limitation that, "When more than one amendment is submitted at the same election, they shall be so submitted as to enable the electors to vote on each amendment separately." And when the legislature by resolution submits such question at a general election, as required by the constitution, it will be presumed that the legislature intends that the requirements of the general election law are to be observed.

4. ———: ———: OFFICERS: ELECTION. When such amendment to the constitution creates a public office, such office may be filled by vote of the electors at the same election at which the amendment is adopted.

5. ———: ———: COUNTING VOTES. The act of 1901 (laws 1901, ch. 29), amending various sections of the general election law so as to provide for counting straight party votes for a constitutional amendment when such party has indorsed such amendment, does not violate the constitution, and it is within the power of the legislature to provide such regulations.

6. ———: ———: BALLOTS. It is not necessary that the entire proposed amendment be printed upon the official ballot. If enough is printed upon the ballot to identify the amendment and show its character and purpose, it is sufficient.

ORIGINAL proceeding in *quo warranto* to determine the right of respondents to hold the office of state railway commissioners. *Dismissed.*

*W. T. Thompson, Attorney General, W. B. Rose* and *Grant G. Martin,* for relator.

*M. B. Reese, Joseph A. Williams* and *Charles O. Whedon, contra.*

SEDGWICK, C. J.

The attorney general, pursuant to a resolution of the house of representatives, filed an information in *quo war-*

*ranto* in this court to test the right of these respondents to hold the office of state railway commissioners and to discharge the duties of that office. The first question presented to the court is as to the validity of the constitutional amendment submitted at the last election. The determination of this question depends upon the meaning and application of section 1, art. XV of the constitution, which is as follows: "Either branch of the legislature may propose amendments to this constitution, and if the same be agreed to by three-fifths of the members elected to each house, such proposed amendments shall be entered on the journals, with the yeas and nays, and published once each week in at least one newspaper in each county, where a newspaper is published, for three months immediately preceding the next election of senators and representatives, at which election the same shall be submitted to the electors for approval or rejection, and if a majority of the electors voting at such election adopt such amendments, the same shall become a part of this constitution When more than one amendment is submitted at the same election they shall be so submitted as to enable the electors to vote on each amendment separately." There is no dis pute as to the facts, which are as follows: The resolution to submit an amendment to the constitution was introduced in the senate of 1905, and was known as "Senate File 196." The senate journal of that year records that on February 15, the 30th day of the session, "Senate File 196, Proposed Amendment to the Constitution of the State of Nebraska," was introduced and read the first time. When the yeas and nays were entered upon its passage in the senate, thirty senators voted in the affirmative and none in the negative, three being absent. The enrolled resolution was signed by the president of the senate, and by the speaker of the house, and approved by the governor, and deposited in the office of the secretary of state. Laws 1905, ch. 233. We have examined the printed copies of the journals of the respective houses and also the original records, and consider that a discussion of such matters as are shown in

the stipulation of facts presented by the parties to this litigation will dispose of all substantial questions presented by these records so far as we have observed. The stipulation of facts upon which the case is submitted recites · "On October 4, 1906, Hon. John H. Mickey, governor of Nebraska, issued his proclamation that on November 6, 1906, there would be a general election held at the usual places of voting for the election of state and district officers and the adoption or rejection of the proposed amendment to the constitution with respect to the state railway commission. A copy of the proclamation is filed herewith marked 'Exhibit 1,' and made a part hereof. Said election was also for the election of senators and representatives, and legal notice thereof was given and posted as required by law. Under the direction of the secretary of state the proposed constitutional amendment was published in at least one newspaper in each county prior to November 6, 1906, which publication contained a notice of the submission of the proposed amendment to the electors for adoption or rejection, but the notice was published in only one newspaper in Logan county, to wit, the Logan County Pioneer, and the first publication was not made until the issue of the paper dated August 9, 1906, and the last publication was made November 1, 1906. The only publication of the notice in Lancaster county was made in the Lincoln Daily Star, the first publication being Saturday, August 3, 1906, in the Saturday issue of that newspaper, and the notice was published only in the Saturday issue of that paper during the three months next preceding November 6, 1906. The Lincoln Daily Star is a daily newspaper, published seven days in the week. The only publication of the notice in Dodge county was made in a newspaper published in Fremont, known as the Fremont Tribune, the first two notices being published in the tri-weekly Tribune and the others in the daily Tribune for the remainder of the three months next preceding November 6, 1906, the tri-weekly and daily being editions of the same paper, published at the same office by the same

publishers. The only newspapers in which the notices were published in Custer county were the Callaway Queen, a weekly paper published at Callaway, and the Ansley Chronicle-Citizen, published at Ansley. The first notice in the Ansley Chronicle-Citizen was not published until the issue of that paper dated August 10, 1906, and the first notice of the proposed amendment in the Callaway Queen appeared in a supplement of that paper printed August 4, 1906. The only newspaper in which the notice was published in Brown county was the Ainsworth Star Journal, a weekly paper published at Ainsworth, and the first issue of that paper in which the notice was published was a special edition of the paper printed Saturday, August 4, 1906. The only publications in Keith and Rock counties of the proposed constitutional amendment were made in the Keith county News, and the one in Rock county in the Rock County Leader, and the first publication was made August 5, 1906, in special editions of the papers, a copy of the one in Rock County Leader being hereto attached and made a part hereof and marked 'Exhibit 3,' and the notice subsequently appeared in the regular weekly editions, the first publication in the weekly edition being August 9, 1906. The notice was published in Dixon county in the Northern Nebraska Journal, a weekly newspaper published in the city of Ponca, and the first publication appeared in a special edition of that newspaper issued Saturday, August 4, 1906. The first notice published in Otoe county appeared in a supplement dated August 3, 1906, a copy of which is hereto attached and marked 'Exhibit 4.' In the other counties of the state the notice was published in at least one weekly newspaper once each week for the three months next preceding November 6, 1906." The stipulation also shows that the three principal political parties of the state in their state conventions each "nominated three candidates for the office of state railway commissioner, and each in its respective platform, duly adopted by said conventions, declared in favor of the approval and adoption of the proposed constitu-

tional amendment, and the declaration became and was made a part of the platforms of these political parties." This action of the political parties "was duly certified to the secretary of state by the chairmen and secretaries of the respective conventions, and the question of the approval or rejection of the proposed amendment and the election of the railway commissioners was printed upon the official and sample ballots, as shown by the sample ballot heretofore referred to and attached hereto, and the ballots so printed were voted at the general election throughout the state, November 6, 1906. "The total number of votes cast at the election was 194,692, of which 147,472 votes were in favor of the adoption and approval of the proposed amendment by counting in favor of the amendment all the straight party votes of the republican, democratic, and people's independent parties, and also the votes where a cross was made in the square at the right-hand side of the ballots opposite the words 'For constitutional amendment with reference to state railway commission,' and not otherwise." The votes were duly canvassed and "Thereafter, on November 27, 1906, Hon. John H. Mickey, governor of Nebraska, issued his proclamation declaring the amendment to be a part of the constitution of the state.

1. The first point presented by the attorney general is that the proposed amendment was not "published once each week in at least one newspaper in each county where a newspaper is published, for three months immediately preceding" the election at which it was submitted to the voters as required by section 1, art. XV of the constitution." The facts above quoted from the stipulation show that there has not been a literal compliance with this clause of the constitution. The election was held on the 6th day of November. The three months named in the constitution are three calendar months and would include the period of time commencing with the beginning of the 6th day of August (*McGinn v. State*, 46 Neb. 427), and to comply literally with this provision the first publica-

tion must be before that day. There was but one paper published in Logan county, and it appears that the proposed amendment was not published in that county until August 9, four days later than the limit prescribed by the constitution. This is the most serious irregularity disclosed in the matter of the publication. It is therefore unnecessary to discuss other irregularities because, unless this failure in Logan county to comply with the letter of the constitution requires us to conclude that the amendment is invalid, the other specified irregularities, which are of a less serious nature, are not sufficient to require such conclusion. The question whether the provisions of the constitution may under any circumstances be considered as directory merely has been very much discussed by the courts of this country. In many cases it has been said that all of the provisions of the state constitution must be considered as mandatory. Judge Cooley in his work on Constitutional Limitations (7th ed. p. 114) introduces his suggestions upon this question by a concise statement of the rules for the construction of statutes in determining in what cases statutory provisions are to be considered as mandatory, and in what cases directory merely. After stating the rules of the construction of statutes in this regard the learned author says: "But the courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitution. Constitutions do not usually undertake to prescribe mere rules of proceeding, except when such rules are looked upon as essential to the thing to be done; and they must then be regarded in the light of limitations upon the power to be exercised. It is the province of an instrument of this solemn and permanent character to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters, it is

lowering the proper dignity of such an instrument and usurping the proper province of ordinary legislation. We are not therefore to expect to find in a constitution provisions which the people, in adopting it, have not regarded as of high importance, and worthy to be embraced in an instrument which, for a time at least, is to control alike the government and the governed, and to form a standard by which is to be measured the power which can be exercised as well by the delegate as by the sovereign people themselves. If directions are given respecting the times or modes of proceeding in which a power should be exercised, there is at least a strong presumption that the people designed it should be exercised in that time and mode only; and we impute to the people a want of due appreciation of the purpose and proper province of such an instrument, when we infer that such directions are given to any other end. Especially when, as has been already said, it is but fair to presume that the people in their constitution have expressed themselves in careful and measured terms, corresponding with the immense importance of the powers delegated, and with a view to leave as little as possible to implication. There are some cases, however, where the doctrine of directory statutes has been applied to constitutional provisions; but they are so plainly at variance with the weight of authority upon the precise points considered that we feel warranted in saying that the judicial decisions as they now stand do not sanction the application."

This is strong language from one of the greatest constitutional lawyers that this country has ever produced. From a careful examination of Judge Cooley's language it appears that he has not attempted to say that no case could arise in which the courts would be justified in inquiring into the purpose and intention of a constitutional provision in determining the application to be made and the force to be given the language used. Establishing a constitution is the work of the whole people. By this means they place limitations upon the powers of their

servants, and also in some respects place limitations upon themselves. There is, of course, no doubt of the power of the sovereign people to change their own work at pleasure, but the people must act by majorities, and in adopting the constitution the majority which did so has prescribed the method by which the majority of the people may alter or amend it. When an amendment is proposed, the minority may say to the majority: "You have placed certain limitations upon your power to change our fundamental law. We insist upon those limitations being observed." No doubt the majority is bound to observe such limitations. An attempt by the majority to change the fundamental law in violation of the self-imposed restrictions would be held ineffectual. Should it be held that the people have by the language used in their fundamental law placed such restrictions on themselves as might result in prohibiting any amendment, however it might be desired by the great mass of the people, and however much the officers and servants of the people might endeavor to comply with those restrictions? The limitation in question, with the construction contended for, might be so used. There are but few voters in Logan county. But one newspaper was regularly published therein. If some accident beyond the control of the publisher should prevent the publication of the paper in which this notice should first have been published, or if some oversight, or some inducement offered to the publisher, had caused the notice to be omitted from that publication, the people of the whole state, although practically unanimous, would be powerless to remedy the defect. If the purposes of the publication had been fully served in other ways, if the proposed amendment had been discussed by the people of Logan county generally, if all of the voters of the county had participated in the election, and if their vote in favor of the proposed amendment had been practically unanimous, still the result would be the same. The will of the people of the state would be defeated by an unimportant accident over which they had no control. If other

provisions of the constitution are mandatory and are to be taken literally, those provisions by which the people have consented to place restrictions upon their own power in adopting amendments to the constitution should not be so construed. We should inquire into the fair purpose and meaning of such restrictions, and should, regard the substance rather than the letter of such requirements. Such conditions as now confront us were evidently not considered by the learned jurist whose language we have quoted.

This particular limitation upon the power of the people to amend their own fundamental law, clothed in the same language as is contained in our own constitution, has been construed by the supreme court of Kansas in an opinion written by Justice Brewer in *Prohibitory-Amendment Cases,* 24 Kan. 700, and, while we should have hesitated to use some of the language contained in that opinion, we think that, so far as it relates to the precise question presented here, it correctly applies the language of our constitution. Indeed, this court is already, so far at least, committed to the language there used by the opinion of this court *In re Senate File* 31, 25 Neb. 864. In the opinion the following language is quoted with approval from the opinion of Justice Brewer above referred to: "The two important, vital elements in any constitutional amendment, are the assent of two-thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded because, by them, certainty as to the essentials is secured. But they are not themselves the essentials. Take a strong illustration: the constitution requires that the 'secretary of state shall cause the same to be published in at least one newspaper in each county of the state where a newspaper is published, for three months preceding,' etc. Suppose a unanimous vote of both houses of the legislature, and a unanimous vote of the people in favor of a constitutional amendment, but that the secretary had omitted to publish in one county in which a newspaper was published, would it not be simply an insult

to common sense to hold that thereby the will of the legislature and people had been defeated? Is it within the power of the secretary, either through ignorance or design, to thwart the popular decision? Is he given a veto, or can he create one? This may be an extreme case, but it only illustrates the principle." After quoting this and other language of Justice Brewer this court, by MAXWELL, J., said: "The case cited from Kansas seems to state the law correctly and has our approval."

We have examined many cases arising in other jurisdictions holding a contrary doctrine, among them several cases from California, and *State v. Tooker*, 15 Mont. 8, 37 Pac. 840, cited by the attorney general. This latter case quotes largely from several strong opinions of other courts and from the language of Judge Cooley noted in this opinion, and fortifies the position taken by reasons worthy of consideration. The force of this case as authority here, however, is very much weakened by two causes. In that case there was no substantial compliance with the constitution. The proposed amendment was published "but for two weeks before the election." And the constitution of that state ordains that all of its provisions "are mandatory and prohibitory unless by express words declared to be otherwise." The court in its opinion quoted with approval the language of the supreme court of California in construing a similar clause of their constitution, as follows: "We will add here that under our constitution no question can be made whether the provision in it for its amendment is mandatory or directory. That question is settled by the constitution itself, which ordains in the most solemn form and manner that each and all of its provisions are mandatory and prohibitory, unless by express words declared to be otherwise. (Art. I, sec. 22). This section, in our judgment, not only commands that its provisions shall be obeyed, but that the disobedience of them is prohibited. *Oakland Paving Co. v. Hilton*, 69 Cal. 512." We do not think that the irregularities shown in the matter of the publication of this proposed amend-

ment in the various counties of the state should be held to defeat the amendment.

2. The next objection to the validity of the amendment suggested by the attorney general is that there was no authority for electing state railway commissioners, and that no such office existed at the time of the general election in 1906. Upon the first proposition it is sufficient to say that the constitution provides that, when an amendment is proposed by the legislature, the same shall be submitted to the electors for approval or rejection at the next election of senators and representatives, and, as to the manner of submitting it, prescribes only that, "when more than one amendment is submitted at the same election they shall be so submitted as to enable the electors to vote on each amendment separately." Section 1, art. XV, above quoted. If the amendment has been submitted to the voters at the general election specified, and the manner of its submission does not violate the only limitation which the constitution provides, it may well be presumed that the intention of the constitution is that it shall be submitted as other questions are, and that the legislature intended that the means of ascertaining the will of the people upon other questions at the general election at which it is required to be submitted should be employed. It will be conceded that, where there is no office, there can be no officer. Constitutions and amendments thereto are created by the vote of the people, and not by a canvass of that vote, nor by the official declaration of the result. If this amendment was adopted, it was when a majority of the electors had voted in its favor, and, when that occurred, it became a part of the constitution and the office of state railway commissioners existed. By the same act of the people that made the amendment a part of the fundamental law, and created the office, these respondents were elected to fill that office. Both matters might properly be submitted to the electors at the same election. This is in accord with universal precedent both in this and in

other states. The practice was introduced into this state by the 6th section of the enabling act.

3. The third question submitted by the attorney general is stated as follows: "Is there authority of law for counting for the constitutional amendment the straight party votes of the republican, democratic, and people's independent party?" In 1895 a statute was enacted providing for the submission of constitutional amendments when two or more were proposed. Laws 1895, ch. 5. The title of the act is "An act prescribing the manner in which two or more proposed amendments to the constitution are to be submitted to a vote of the people and providing for the printing and distribution of ballots containing such proposed constitutional amendments." The two principal things accomplished by this act were to require the state to furnish the official and sample ballots for submitting such amendments, and to enable the voter to "vote for or against all the proposed amendments or questions printed on the ballot, by simply making a cross-mark (X) opposite the word 'Yes' or 'No,' according to the answer he wishes to give." Section 5 of the act however provided: "It shall be the duty of the county commissioners of each county to provide a separate ballot box for each voting precinct in which to deposit the ballots provided for in this act." This section was not complied with in submitting the amendment in question, and it is suggested that this invalidates the amendment. The act of 1895, however, has no application in this case, since but one amendment was submitted, and that act was intended to apply only when two or more amendments were submitted. In 1901 an act was passed by the legislature amending twelve sections of chapter 26 of the Compiled Statutes, the general election law. Laws 1901, ch. 29. Among the sections so amended was section 127, which provided for making nominations to office. The amendment consisted in inserting the following provision: "A state convention of any political party may take action upon any constitutional amendment, which is to be voted upon at the fol-

lowing election, and said convention may declare for or against such amendment, and such declaration shall be considered as a portion of their ticket to be filed with the secretary of state and by him certified to the various county clerks." Also section 129 was amended. This section related to the manner of certifying nominations to the proper officers, and the amendment to this section consisted in inserting the following provision, after stating what the certificate of nomination shall contain: "Also any party action taken relative to any proposed constitutional amendment, whether for or against, shall be in writing and shall form a part of such certificate." And also provided that certificates of nomination of candidates for certain offices "or any party action taken relative to any proposed constitutional amendment shall be filed with the secretary of state." Section 135, which is also amended, required the secretary of state to certify nominations to the county clerk of each county, and, as amended, after providing other things to be stated in the certificate, contained the following: "And also any proposed constitutional amendment, or party declaration relative thereto, or other question to be submitted to the people of the state for popular vote." Section 140, which related to the form of official ballot, was also amended and was made to contain the following: "Whenever the secretary of state has duly certified to the county clerk questions to be submitted to the vote of the people, the county clerk shall have printed below the names of all candidates upon the regular ballots the question in such form as will enable the elector to vote upon the question so presented. On constitutional amendments submitted to the voters, where a 'For' or 'Against' vote is required, and where any political party has in state convention taken action as a party either for or against such amendment, the county clerk shall have the name of such political party printed directly after the words 'For' or 'Against,' as the case may be, so as to plainly indicate to the voter the stand taken by such party on such amendment, as shown

in schedule 'A' of section 160." Section 146, which pro-
vided for furnishing the ballots to voters and for instruct-
ions to the voter, was also amended so as to contain the
following: "If he wishes to vote a straight party ticket
he shall make a cross in the circle at the right of the name
of his party at the head of the ballot, and his vote shall
be considered as a vote for every candidate and endorsed
constitutional amendment of that party on the ballot. If
the voter does not wish to vote a straight ticket he shall
make a cross in the square to the right of every candidate
for whom he desires to vote, or, in a presidential election,
by making a cross in the circle to the right of the presi-
dential electors of his choice; if he desires to vote for all
the electors of one party, or by writing the name of the
person for whom he desires to vote, and whose name is
not printed on the ballot, in the blank space provided
therefor and making a cross in the square to the right
thereof; and in case of a question to be submitted to the
vote of the people, by making a cross in the square to the
right of the answer he wishes to give. When a voter shall
have made a cross in one of the circles for a straight
party ticket, and shall have also made crosses in any of
the squares to the right of the name of any candidates or
in either square to the right of any constitutional amend-
ment his vote shall be so counted as a vote for said can-
didates and for or against said amendments, as the case
may be, but for all other offices or constitutional amend-
ments his vote shall be counted for the candidates and
party action concerning amendments of that party in
whose party circle he has made a cross." The requirement
of the constitution is: "When more than one amendment
is submitted at the same election, they shall be so sub-
mitted as to enable the electors to vote on each amendment
separately. Const. art. XV, sec. 1. The objection that
the provisions of our statute above quoted are not such
"as to enable the electors to vote on each amendment
separately," when several amendments are submitted, ap-
pears to be without foundation. The voter may vote a

straight party ticket if he desires, but he is not compelled
to do so. He may vote a straight party ticket in general
and make such exceptions as he desires either as to the
individual candidates or as to any proposed constitutional
amendment. The directions for so doing in the statute
appear to be practicable and without uncertainty. It is
not the duty of the court to suggest methods of submitting
constitutional amendments to the vote of the people. The
duty of devising and applying such methods is devolved
upon the legislature, and, unless the method adopted by
the legislature is manifestly a violation of the constitu-
tion, and unless it clearly appears that the method adopted
by the legislature will not make it practicable for the
voters to express their judgment as to each amendment
proposed, the courts are not at liberty to disregard the
will of the legislature. A similar method of submitting
constitutional amendments has been upheld by the su-
preme court of Ohio. *State v. Laylin,* 69 Ohio St. 1. It
was evidently the intention of the legislature by enact-
ing the amendments to the election law embraced in the
act of 1901 (laws 1901, ch. 29) to revise the provisions
of the statute in regard to the form of the ballot and the
manner of voting in the submission of constitutional
amendments. We do not think that the failure to repeal
section 5 of the act of 1895 should result in thwarting this
design. The provisions contained in the later act are
complete in themselves and cover the whole general sub-
ject, and ought to be regarded as the final expression of
the legislative will. The record shows that this amend-
ment was submitted to the electors by a practically unani-
mous vote of the legislature, and that the merits of the
amendment were thoroughly discussed throughout the
state, and well known to the voters, and was adopted by a
very large majority of all the voters participating in the
election.

4. The attorney general suggests "that the entire pro-
posed amendment to the constitution should be printed in
full upon the official ballot." Of course, there is no

ground for such a supposition. The provision of the constitution is that the amendment shall be submitted to the electors for approval or rejection, but this does not require that the whole amendment so submitted shall be upon the ballot. Enough was printed upon the ballot to identify the amendment referred to and to show its character and purpose, and that is all that is required. The respondents are citizens and qualified electors of the state and appear to have properly qualified pursuant to their election. We conclude that the constitutional amendment in question has been regularly adopted and has become a part of the constitution of the state, and that the respondents are the legally elected and regularly qualified state railway commissioners.

The information is therefore

DISMISSED.