## HOUSER, ordinary, *v.* HARTLEY.

The exception to the judgment of the court making the mandamus absolute in this case is based upon the contention of the respondent that the court did not have jurisdiction of him in proceedings instituted in Houston County, as he was a resident, not of Houston County, but of Peach County, which has been created by the ratification, duly declared, of the amendment to the constitution of the State proposed in the act of the legislature, approved August 15, 1922. *Held*, that the fact of the ratification of the amendment referred to is not established in this record; and the court did not err in granting the mandamus absolute.

No. 3810. DECEMBER 19, 1923.

Mandamus. Before Judge Malcolm D. Jones. Houston superior court. May 15, 1923.

An act of the Georgia legislature, passed by a two-thirds vote and approved August 15, 1922, proposed a constitutional amendment for the creation of Peach County, which was voted on in the general election, November 7, 1922. The act provided that the Secretary of State should canvass the returns and ascertain and certify the result of the election. There was no provision in the act for any contest or review of the finding of the Secretary of State. During the canvass of the returns Senator J. E. Davidson, author of the bill embodied in the act, filed with the Secretary of State objections to his including in such canvass certain purported returns, on the ground that the same were not legal returns and not such as could be included in any certification of the result of the election, these objections being of a threefold nature, summarized as follows: (1) In twenty-eight counties listed in Exhibit A, attached to the objections, no legal quorum of any one of the consolidation boards of such counties consolidated the vote and certified the result of the election to the Secretary of State. (2) In eleven counties listed in Exhibit B, attached to the objections, purported consolidated returns were made and sent to the Secretary of State, but were unaccompanied by any voters' list, tally-sheets, or copies of superintendents' oaths, all of which are required by law, and without which the Secretary of State cannot ascertain if the consolidated returns were made and subscribed by a lawful quorum, or by the persons the law requires shall sign them, or if the elections were held by the proper persons or at the proper places. (3) In five counties, listed in Exhibit C, attached to the objections, elections were held by persons who did not ap-

pear to be qualified to hold them. In these objections the number of votes purporting to be for and against the Peach County amendment were given for each class of counties. The objections concluded with the following paragraph: "Wherefore, the premises considered, it is urged that the Secretary of State's office is without authority of law to include any of the above-named illegal returns in the certification of the result of the election, and the Honorable Secretary of State is respectfully requested to exclude each and all of such returns from his certification of the result, especially as such illegal returns, if included in the certification, would change the result of the election upon the constitutional amendment in question."

More than forty-eight hours before the Secretary of State made and issued his certificate of the result of the election, a copy of the Davidson objections was served in the office of the Secretary of State on counsel "representing certain citizens of Houston and Macon counties (from which counties the new county was created) who were opposing the ratification of the amendment." On November 27, 1922, the Secretary of State issued his official certificate of the result of the election as to the Peach County amendment, which is in part as follows: "I certify that on the face of the returns the total vote cast at the said election held November 7, 1922, for the ratification of the amendment creating Peach County was 29,842 votes, and that on the face of the returns the number of votes cast against the ratification of the amendment creating Peach County was 36,566 votes. Before it was possible to prepare this certificate, I was served with a protest by Hon. J. E. Davidson, who acted as State Senator for the 23rd senatorial district, as author of the proposed amendment, and also as taxpayer and a citizen, objecting to the counting of the vote alleged to have been cast in numerous counties, for the reasons which are set out in the notice of protest. I attach hereto a copy of that protest filed by Mr. Davidson. The objections made are a general disregard of the positive requirements of our law as to the persons who are to conduct elections, and as to the manner in which these elections are to be held, and the manner in which they were to be certified. Without going into detail, because I submit to you the entire record in the case, it is pointed out in this protest that in two counties the certified consolidated returns now in this

office, bearing a large number of names, were manifestly all written by one and the same hand. In other respects, it appears that a single person held an election in a given precinct, and that in many of the returns there is no evidence that the persons holding the elections were legally qualified. I submit to you the detailed statement, which I have had compared with the original records in this office, and which I find to be fully corroborated by the orig-' inal consolidated returns." The remainder of the certification is set forth in the opinion. The Governor deemed it essential to have a judicial construction of the meaning of this certificate of the Secretary of State before issuing his proclamation, and withheld the issuance of the same until such judicial determination could be had.

Subsequently, upon the death of Capt. J. W. Mathews, justice of the peace for the 528th militia district in said County of Peach, the plaintiff below, Hartley, requested the defendant below, Houser, as ordinary of Houston County, to call an election to fill the vacancy, Hartley desiring to run for the position, there being no other justice of the peace in the district, and the district having been within the County of Houston prior to the creation of the new county. Upon the refusal of the ordinary of Houston to call the election, on the ground that this was the duty of Holland, ordinary of Peach County, and not the duty of the ordinary of the old county, mandamus proceedings were brought in the superior court· of Houston County, to compel the ordinary of Houston County to call the election. Houser filed his plea to the jurisdiction, and made answer to the petition for mandamus, setting out the creation of the County of Peach as above outlined and his residence therein. The plaintiff, in an amendment to his petition, admitted the truth of all the statements of fact in the plea and answer, denying only the legality of the creation of Peach County. On the hearing, the judge of the superior court considered the plea in connection with the answer, and granted the mandamus absolute as prayed for. To this judgment the plaintiff excepted:

*Claude M. Houser, W. H. Harris,* and *C. L. Shepard,* for plaintiff in error.

*A. C. Riley Jr.* and *Duncan & Nunn,* contra.

BECK, P. J. (After stating the foregoing facts.) The act proposing the constitutional amendment in question provides: "If a

majority of the electors qualified to vote for members of the General Assembly voting thereon shall vote for the ratification of said proposed amendment, then the Governor shall, when he ascertains the same from the Secretary of State, to whom the returns of said election shall be referred in the manner as in cases of elections for members of the General Assembly, to count and ascertain results, issue his proclamation for one insertion in one daily paper of this State, announcing such results, and declaring the amendment ratified." Acts 1922, p. 28. And it is insisted by counsel for the plaintiff in error, who contend that the act proposing the amendment was ratified, that the Secretary of State, after canvassing the returns, ascertained that the result was in accordance with this contention, and declared that the amendment was duly ratified. Conceding that a declaration of the result of the election by the Secretary of State would be final and conclusive upon the question as to whether or not the amendment was ratified, we have, after careful consideration of the certificate made by the official referred to, reached the conclusion that he did not declare the result of the election to be that the amendment was ratified. He does certify to the Governor that "The contention is that the irregularities complained of will cause the throwing out of 3,857 votes cast for the creating of Peach County, and will throw out 8,958 votes cast against the amendment creating Peach County, in which it affirmatively appears that the returns are not legally certified. It further appears that in cases where returns are not accompanied by the papers required by law, where there is nothing to show whether they were legally certified or the election legally held, there should be thrown out of the votes counted for Peach County 1,192 votes, and in the same class of counties, of the votes cast against the Peach County amendment there should be disregarded 4,007 votes. It further appears that in those counties whose consolidated returns were based on illegally held elections at precincts, there should be thrown out of the vote cast for Peach County 300 votes, and of the vote cast against Peach County 956 votes. To sum up the differences on the assumption that the objections are real and substantial and of such character as to invalidate the returns, the total decrease in the vote for Peach County would be 5,349 votes, leaving the actual and legal vote cast for the ratification of the amendment creating Peach County 24,493 votes." And he then adds

this statement: "The deductions made for the same reasons in the vote cast against the ratification of the amendment creating Peach County would be 13,921 votes, leaving the total legally cast vote against the ratification 22,645 votes." And then there. follows in this certificate two closing paragraphs, in which the Secretary of State shows that he does not pass finally and absolutely upon the issues and questions involved. Those paragraphs are in this .language: "If these objections are sound and valid, then there was a majority for the ratification of the amendment creating the County of Peach, of 1,848. The Secretary of State is not a judicial officer, and his functions are purely ministerial. No discretion is vested in him under the constitution or the law; but apparently, if discretion is lodged anywhere, it is in the Governor, whose duty it is, under the constitution, whenever a proposed constitutional amendment receives a majority of the votes cast, to issue his proclamation declaring the same to have been ratified."

In the statements in the certificate preceding the last two paragraphs are presented certain objections to counting votes contested, a statement of the opinion of the Secretary of State that in certain respects there had been a failure to comply with the law, and then, instead of a declaration of the final result, the Secretary of State certifies that, "if these objections are sound and valid, then there was a majority for the ratification of the amendment creating the County of Peach, of 1,848 votes. But he expressly declines to pass upon the question as to whether the objections were sound and valid. We say expressly declines; his conclusion is in this language: "The Secretary of State is not a judicial officer, and his functions are purely ministerial." In this certificate he adds that he has no ·discretion, that none is vested in him under the constitution or the law; but he decides that apparently, if discretion is lodged anywhere, it is in the Governor, whose duty it is, he concludes, whenever a proposed constitutional amendment receives the majority of the vote cast, to issue his proclamation declaring the same to have been ratified. Whether as a court, upon a record properly presenting the question, we would have jurisdiction to decide whether a proposed amendment to the constitution was ratified, without a declaration to that effect made by the officer clothed with the .authority under the law to make it, we do not now adjudicate, as no record properly presenting that question is

now before us, and the plaintiff in error is not asking a judicial determination of the result of the election. Moreover, in that portion of the act proposing the amendment which prescribed who shall declare the amendment ratified, it is provided, after declaring that the returns of the election shall be referred to the Secretary of State in the manner as in case of elections for members of the General Assembly, "to count and ascertain the results," that the Governor shall announce the result and declare the amendment ratified, if a majority of the electors qualified to vote for members of the General Assembly, voting in the election, shall vote for the ratification of the proposed amendment. And we are of the opinion that before a court could hold that the amendment had been ratified, it must appear that the Governor actually declared it ratified, unless the question of ratification or non-ratification is presented in this court in a record properly raising the question for judicial determination. Of course that would involve, along with the presentation of the question, a proper exhibit of all the facts necessary for its determination; and that is not done in this case. It is not in all cases indispensably necessary that the Governor or the Secretary of State should declare an amendment to the constitution ratified; and the Governor could not be compelled by mandamus to declare the result and issue his proclamation; nor is it essential that such could be done. It is competent for this court, where the question is properly raised and brought here for adjudication, to decide that very question. *Hammond* v. *Clark,* 136 *Ga.* 313 (71 S. E. 479, 38 L. R. A. (N. S.) 77).

In the plea filed by Houser, the respondent named in the application for the writ of mandamus, the plaintiff in error here, it is alleged, among other things, after setting forth parts of the certificate of the Secretary of State, and what he contends are the logical deductions to be made from that certificate, that "The Governor, upon receiving the certificate, likewise took the position that it was without the scope of his authority to determine as to the validity and soundness of the objections referred to by the Secretary of State, but that same would have to be judicially determined by some court of competent jurisdiction; and therefore issued no proclamation as to the Peach County amendment, holding the matter in abeyance until a judicial determination could be had as to the soundness and validity of the objections, which, if found to be

sound and valid, would, under the terms of the certificate of the Secretary of State, render the same definite and certain to the effect that the amendment to the constitution creating the County of Peach was duly ratified." And so, neither by the Governor nor by the Secretary of State has there been a final, absolute declaration of the ratification of the amendment. Moreover, we are of the opinion that the consolidated returns of counties should not have been thrown out for irregularities and merely because the returns were not accompanied by all the papers required by law, and because the papers were not certified in accordance with the statute directing how they shall be certified. Suppose that in 28 counties no legal quorum of any one of the consolidation boards of such counties consolidated the vote and certified the result of the election to the Secretary of State, and in other counties the consolidated returns were unaccompanied by any voters' lists, tally-sheets, or copies of superintendents' oaths, as directed by the statute, and without which the Secretary of State cannot ascertain if the consolidated returns were made and subscribed by a lawful quorum, should the votes of these counties be cast out merely because of these irregularities? We think not. Suppose that the majority in one large county of the State, in favor of the adoption of the ratification of the amendment, had been sufficient to overcome the adverse majority in the rest of the State, and returns had been sent up showing this, but the proper officials having authority to consolidate the vote had purposely refrained from and refused to sign the returns, although the election in each precinct in the county was regularly and legally held, should the action of these recalcitrant officers be sufficient to defeat the will of the people as expressed at the election? The election in this State was by precincts. It appears from the Secretary of State's certificate that in certain counties the consolidated returns were based on "illegally held elections at precincts;" but the votes cast in these precincts where the election was illegally held were insufficient to affect the result one way or the other. In order to have declared a different result from that appearing on the face of the returns, it would have been necessary for the Secretary of State to throw out the votes of some 28 counties in which it appears that there was "no consolidated certificate signed by a majority of the superintendents of the election at the county site and by at least one superintendent

from each of the other precincts. . . The total apparent vote excepted to of these 28 counties was 3,857 for the amendment and 8,958 against the amendment." The Secretary of State was of the opinion that these returns were illegal; but he did not throw out the votes, for the reason set forth in his certificate. And we are of the opinion that he should not have done so.

The Political Code, § 82 (which relates to the manner of conducting elections), subsection 9, declares: "They [the superintendents of the election] shall make and subscribe two certificates, stating the whole number of votes each person received in the county; one of them, together with one list of voters and one tally-sheet from each place of holding the election, shall be sealed up and, without delay, mailed to the Governor; the other, with like accompaniments, shall be directed to the clerk of the superior court of the county, and by him deposited in his office." We are of the opinion that this section of the Code is directory, and not mandatory. Section 82, subsection 7, has been declared to be directory. *Tanner* v. *Deen,* 108 *Ga.* 95 (33 S. E. 832). And with equal reason section 82, subsection 9, should be held to be so. In the case of *Hammond* v. *Clark,* supra, it was said: "In the Constitutional Prohibitory Amendment Cases, 24 Kans. 700, 710, Justice Brewer, who later became a member of the Supreme Court of the United States, thus strongly set forth the position that mere immaterial omissions or errors, which work no wrong to substantial rights, should be disregarded: 'The two important, vital elements in any constitutional amendment, are, the assent of two thirds of the legislature, and a majority of the popular vote. Beyond these, other provisions are mere machinery and forms. They may not be disregarded, because, by them, certainty as to the essentials is secured. But they are not themselves the essentials.' . . In People v. Sours, 31 Colo. 369 et seq. (74 Pac. 167, 102 Am. St. R. 134), the same view was taken. Steele, J., said: 'At the outset it should be stated that every reasonable presumption, both of law and fact, is to be indulged in favor of the validity of an amendment to the constitution when it is attacked after its ratification by the people.' See also Thompson v. Winnett, 78 Neb. 379 (110 N. W. 1113, 10 L. R. A. (N. S.) 149); State v. Laylin, 69 Ohio St. 1 (68 N. E. 574); Weston v. Ryan, 70 Neb. 211 (97 N. W. 347). This liberal interpretation applies rather to the manner of compliance

with constitutional requirements in regard to amendments than to a total omission or disregard of such a requirement. It has not generally been held that an essential requirement could be entirely omitted, nor does the present case require us to take that position. But we concur in the view that substance is more important than form, and that the will of the legislature lawfully expressed in proposing an amendment, and the will of the people expressed at the proper time and in the proper manner at the ballot-box, in ratifying such amendment, ought not to be lightly disregarded and set at naught, even if an executive or ministerial officer should not strictly comply with his duty in connection with matters of detail, regarding the publication, or the like, and which do not appear to have substantially affected the result."

"The right to an office by virtue of an election by the required number of votes cannot be defeated by the mistake, negligence, or misconduct of a canvassing board. Inasmuch as the duties of canvassing boards, except as to determining the genuineness of the returns, are generally regarded as merely ministerial, the omissions or mistakes of such boards can have no controlling influence on the election." 20 C. J. 204. In the case of People v. Van Cleve, 1 Mich. 362 (53 Am. D. 69), it was said: "In a republican government, where the exercise of official power is but a derivative from the people, through the medium of the ballot-box, it would be a monstrous doctrine that would subject the public will and the public voice, thus expressed, to be defeated by either the ignorance or the corruption of any board of canvassers. The duties of these boards are simply ministerial; their whole duty consists in ascertaining who are elected, and in authenticating and preserving the evidence of such election. It surely cannot be maintained that their omissions or mistakes are to have a controlling influence upon the election itself." In the same connection see the extended note to the case of People v. Green, Ann. Cas. 1916A, 707.

In view of all the facts in this record and the issue presented hereby, we conclude that the court properly held that the plea to the jurisdiction was not sustained, and then properly granted the mandamus absolute; for no other ground of error in the judgment rendered by the court is argued or urged than that based upon the ratification of the amendment creating the County of Peach, in consequence of which, it is contended, the respondent was a resi-

dent of Peach County and not of Houston County, in which the proceedings were brought.

*Judgment affirmed. All the Justices concur, except Russell, C. J., dissenting.*

HILL, J., concurs specially.

RUSSELL, C. J., dissenting. I am of the opinion that the judgment of the lower court should be reversed. Of course, assuming that there never was an election as to the creation of Peach County, the trial judge could very properly have issued a mandamus absolute. But to do this, in my opinion, the record would have to be disregarded, and it is by the record alone that causes in this court should be adjudicated. I shall briefly call attention to some facts in the record which are undisputed. The case arises upon a petition by one Hartley to the ordinary of Houston County, asking that an election for justice of the peace for the 528th district of Houston County be ordered as provided by law, to fill the vacancy caused by the death of the justice of the peace in that district, upon the ground that there is no justice of the peace in the district to order the election, as is usually done in such cases. The petition for mandamus alleges that the ordinary of Houston County refused to perform this duty devolving upon him by law. In response to a rule nisi the ordinary, as respondent, filed first a plea to the jurisdiction, and later an answer responding to each paragraph of the petition. As it appears from the record that every allegation of fact set forth in the answer of the respondent was admitted in the trial before the judge of the superior court to be true, thus eliminating any possible issue of fact, except the creation of Peach County, and the question for our consideration being one of law only, it becomes most material that the admitted facts be clearly understood.

The respondent's plea to the jurisdiction (and also his answer) rested upon the single admitted fact that he was a citizen of Peach County. Therefore the determination as to whether or not the case was correctly decided in the lower court depends upon a determination (from statements of fact uncontroverted and uncontradicted) as to whether there is such a political subdivision of this State as Peach County. It is admitted that by virtue of an act of the General Assembly approved August 15, 1922, there was duly submitted for ratification or rejection, at the general election held

in Georgia on November 7, 1922, a constitutional amendment creating the County of Peach. It is admitted in the amendment to the petition that the result of the election was in favor of the ratification of said constitutional amendment, and that thereby Peach County was duly and constitutionally created. With this last admission ordinarily it would be said, that, the defendant having pleaded that he was a resident of Peach County and the petition for mandamus being addressed to the ordinary of Houston County, there could be but one judgment, and that one which would dismiss the petition for mandamus. But, conceding for argument's sake that the case is such that admissions of the opposing party count for nothing and cannot be considered, that the court has no judicial knowledge of the existence of such a subdivision of Georgia as Peach County, and that despite the fact that the petitioner for mandamus admitted at the hearing the existence of Peach County, we will next inquire whether the admission of other facts set forth in the defendant's answer established the fact of the existence of Peach County, independent of the admission. This court can safely take judicial cognizance of any historical fact of general interest. The court knows, as a matter of common knowledge, that an election was held at which the creation of Peach County was submitted to the people of this State, following the passage of the act approved August 15, 1922 (Acts 1922, p. 28). There is nothing to contradict the statement that this question was duly submitted at the general election of November 7, 1922. But it is insisted in the amendment to the petition for mandamus that the election did not result in creating this new county.

In the second section of the act of 1922, supra, it is provided that "If a majority of the electors qualified to vote for members of the General Assembly voting thereon shall vote for the ratification of said proposed amendment, then the Governor shall, when he ascertains the same from the Secretary of State, to whom the returns of said election shall be referred in the manner as in cases of elections for members of the General Assembly to count and ascertain results, issue his proclamation for one insertion in one daily paper of this State, announcing such results, and declaring the amendment ratified." It will be noted that the returns are to be referred to the Secretary of State as in cases of election for members of the General Assembly, "to count and ascertain results";

and that when these results are communicated to the Governor, the Governor is to announce the result, and he is to declare the amendment ratified. It appears from the report of the Secretary of State to the Governor that he ascertained the results of the election and communicated his finding of facts to the chief executive. It further appears that the Governor has not issued a proclamation or declaration of the result; so we are met here with two questions: First, did the Secretary of State "count and ascertain results," as was his duty, and communicate his finding of facts to the Governor? Second, is the declaration or proclamation of the results ascertained by the Secretary of State essential to the adoption of this amendment to the constitution and the creation of the proposed county?

As to the first question: The certificate of the Secretary of State to his Excellency, Governor Thomas W. Hardwick, contains the statement of the result in the election held upon the subject of ratifying three other amendments besides the amendment now before us. It will be noted that in each of these reports, as in the case of the Peach County amendment, nothing more is stated than the number of votes cast for and against these amendments respectively. It appears from the facts stated in the certificate or report of the Secretary of State, that, according to the number of votes reported to have been cast, the amendment to increase the salary of the judge of the superior court of Muscogee County was defeated, while in the case of a similar amendment as to the Augusta Circuit the proposed amendment appears to have been adopted. It also would seem, from the figures reported, that the amendment creating a new senatorial district was defeated. But the Secretary of State did nothing more than to state the facts as he had ascertained them, nothing except the bare figures giving any indication that one of these three amendments had apparently carried and two were apparently lost. A like course was pursued by the Secretary of State with reference to the ascertainment and statement as to the count and results ascertained as to the proposed amendment creating Peach County, except that the Secretary of State, having ascertained that there were defects in the returns from thirty-four counties, the names of which appear in the record, and which the Secretary of State was of the opinion should be thrown out and disregarded, reported that if his conclusion as to

these counties was correct there was a majority (of 1,848 votes) for the ratification of the amendment creating the County of Peach of 1,848 votes. The Secretary of State concluded here his ascertainment of the result, for the sound reason, as we think, as stated in the report to the Governor that "the Secretary of State is not a judicial officer, and his functions are purely ministerial. No discretion is vested in him under the constitution or law, but apparently, if discretion is lodged anywhere, it is in the Governor, whose duty it is, under the constitution, whenever a proposed constitutional amendment receives a majority of the votes cast, to issue his proclamation declaring the same to have been ratified." So far as the use of language could go, and so far as his legitimate powers extended, the Secretary of State, in my opinion, ascertained that the result of the election was the creation of Peach County by 1,848 votes, and informed the Governor of the result. Of course, as stated by him, the correctness of this holding rests upon the proposition that his conclusions of law as to the counties which should be thrown out or disregarded are correct. There is no question about the fullness and clearness and exactness on the votes actually cast in these counties. Under the act submitting this amendment there is no provision for review, and whatever the Secretary of State reported "to be the results" of the election is final. According to Exhibit A attached to the certificate of the Secretary of State, twenty-eight named counties apparently cast for the amendment 3,857 votes and 8,958 votes against the amendment. Eleven named counties cast for the amendment 1,192 votes and 4,070 votes against the amendment. Five named counties cast 300 votes for the amendment and 956 votes against the amendment. The total vote apparently cast both for and against the amendment was 66,408, of which 36,566 were against the amendment and 29,842 in favor of its ratification. The total vote in the thirty-four counties which the Secretary of State was of the opinion should be thrown out was 5,349 for the amendment, and in the same counties there were cast against the amendment 13,921 votes; and it thus appears that if the vote of only those counties which complied with the law is counted, there were cast only 22,645 votes against the amendment, while 24,493, a majority of the votes properly returned, voted for its ratification.

. But it is insisted, contrary to the opinion of the Secretary of State, that none of the defects in the returns should prevent the votes of the counties as returned from being counted. It is certified by the Secretary of State that in the counties of Banks, Cherokee, Early, Heard, and Taliaferro, in half or more of the precincts in each of such counties, the persons purporting to have held the election as superintendents do not appear to have been qualified to hold such election. Eleven Counties, to wit, Berrien, Catoosa, Dougherty, Macon, Morgan, Pickens, Screven, Turner, Walker, Walton, and White, had no voters' list, tally-sheet, or copies of superintendents' oaths, as a part of their consolidated returns, all of which are required by law. In twenty-eight counties, Bartow, Butts, Carroll, Cobb, Columbia, Coweta, Dawson, Decatur, Franklin, Forsyth, Gwinnett, Hall, Haralson, Henry, Jackson, Jones, Meriwether, Montgomery, Newton, Paulding, Pike, Spalding, Sumter, Talbot, Telfair, Troup, Webster, and Wilkes, there was no consolidated certificate subscribed by a majority of the superintendents of the election as required by law. Section 82, subdivision 9, of the Civil Code (1910), requires: "The superintendents, to consolidate the vote of the county, must consist of all those who officiated at the county-site, or a majority of them, and at least one from each precinct. They shall make and subscribe two certificates, stating the whole number of votes each person received in the county; one of them, together with one list of voters and one tally-sheet from each place of holding the election, shall be sealed up and, without delay, mailed to the Secretary of State; the other, with like accompaniments, shall be directed to the clerk of the superior court of the county, and by him deposited in his office. Each of said returns must contain copies of the original oaths taken by the superintendents at the court-house and precincts."

It is urged that by reason of the terms of section 126 of the Code, that "No election shall be defeated for non-compliance with the requirements of the law, if held at the proper time and place by persons qualified to hold them, if it is not shown that, by that non-compliance, the result is different from what it would have been had there been proper compliance," the provisions of section 82 of the Civil Code are merely directory and of little, if any, importance. It will be observed, however, that there are three conditions stated in section 126, before such a deduction can be

drawn. The caption of that section is: "Election not set aside for formal defects, when." "If held at the proper time and place by persons qualified to hold them," the election shall not be "defeated for non-compliance with the requirements of the law," unless it is shown that by the non-compliance "the result is different from what it would have been had there been proper compliance." How can any mortal man tell the results of an election from a county from which there is no return of the results? If the requirements of the law are not complied with, how can it be determined that an unsigned, unsworn paper is an accredited return of what actually transpired and of the vote actually cast? It stands as one of the necessary foundations upon which the security and purity of elections must stand, if they stand at all, that the votes cast shall be counted. It is a travesty to allow the vote to be deposited and then counted for one for whom it was not cast, or not to be counted at all. I cannot concur in the opinion that the requirements of section 82 mean any less than their language imports, nor agree that language which to my mind is plainly mandatory shall be treated as merely directory. If this argument is sound, then there is no necessity for a vote by ballot, no need for a list of the voters to be kept, no necessity for the managers being sworn, no necessity for the return of the election to be verified by oath, provided only that the polls be opened by three citizens at the proper time and place, and all persons are permitted to vote and their votes are counted as the managers decide they should be, without regard to the wishes of the voters, whether expressed orally or in a writing, by ballot. As I have before stated, the act submitting the constitutional amendment now under consideration made it the duty of the Secretary of State to ascertain the result. This he has done, and has, in effect, stated, by his final figures, that the amendment received more than 24,000 votes as contrasted with something over 22,000 in opposition to ratification.

The Governor has not declared the result, but that is not essential to the ratification of a constitutional amendment, as held in the case of *Hammond* v. *Clark,* 136 *Ga.* 313 (supra). In the first headnote of that case it was held: "In the absence of some other exclusive method of determination provided by the constitution, whether an amendment has been properly proposed and adopted

according to the requirements of the existing constitution, and has become a part of the fundamental law of the State, is generally a judicial question." In dealing with the subject in the opinion, Justice Lumpkin, speaking for the court, says: "In dealing with the first question, counsel for plaintiff in error contended that the proclamation of the Governor declaring that the amendment was adopted was conclusive, and that the courts could not inquire into the question. To this contention we cannot assent. The constitution is the supreme State law. It provides how it may be amended. It makes no provision for exclusive determination by the Governor as to whether an amendment has been made in the constitutional method, and for the issuance by him of a binding proclamation to that effect. Such a proclamation may be both useful and proper, in order to inform the people whether or not a change has been made in the fundamental law, but the constitution did not make it conclusive on that subject. When the constitution was submitted for ratification as a whole, a provision was made for a proclamation of the result by the Governor. Constitution, article 13, section 2, paragraph 2 (Civil Code (1910), § 6613). But in reference to amendments, there is no such provision. Constitution, article 13, section 1, paragraph 1 (Civil Code (1910), § 6610). In the absence of some other exclusive method of determination provided by the constitution, the weight of authority is to the effect that whether an amendment has been properly adopted according to the requirements of the existing constitution is a judicial question." It certainly follows that, if the proclamation of the Governor either that an amendment has been ratified or defeated can be nullified by judicial decision, as just quoted, there would certainly be a duty resting upon the court, when no proclamation had been made, to decide whether the amendment had in fact been ratified or rejected, where the interests of one or all of the citizens of the State were directly affected by the result of the election which had been held. It appears from the record in this case that his Excellency, Governor Hardwick, declined to decide or issue a proclamation, upon the ground that it was a question which should be submitted to the courts for decision. And bearing in mind the essential constitutional provision that the three co-ordinate branches of the government shall be distinct from and independent of each other, I think his course in the matter is not open to

criticism; especially in view of the ruling of this court in *Hammond* v. *Clark*, supra.

Is the question properly presented? It is insisted that sufficient facts do not appear in the record to enable the court to determine the question of the establishment of Peach County. I cannot agree with this contention. As stated before, there is no appeal from the facts as stated by the Secretary of State to have been ascertained by .him in accordance with his duty in that regard as imposed by law. He states as a fact what was the total vote of all the counties of the State. The defendant in error admits the truth of that statement. By what rule of adjudication is there a higher form of proof provided than the agreement of parties that a certain thing is a fact? It must be presumed that the worthy and distinguished Secretary of State has performed his .duty and counted the returns from each of the 160 counties in this State. It cannot otherwise be presumed, without attributing to him flagrant negligence in the performance of the specific duty of going into all of the returns from each and every county and consolidating the vote of every one of them. He states the sum total of the votes apparently cast in the entire State, thus again evidencing the fact that he has either performed his duty by ascertaining this result from actual inspection of all the returns from each county (required by law to be separately mailed to him); or else he is stating as a fact matters which he has not investigated, votes that he has not counted, and results of which he knows nothing. Assuming that the Secretary of State has done his duty and examined severally and separately the returns from each and all of the counties and has correctly ascertained the total vote of all the counties, he has deducted from the vote cast against the proposed amendment 13,655 votes, and from the votes apparently cast in favor of the amendment 5,700 votes, as appears from returns of counties which he says should be *thrown out* and should be *disregarded*. With these deductions, he gives as the final figures the vote in favor of the amendment as 24,493, and the vote against the amendment 22,695, leaving a net majority in favor of the adoption of the amendment of 1,848 votes. What more could possibly be shown as necessary to complete the ratification of the amendment, except the proclamation by the Governor? And as we have already shown, the absence of this paper or the non-performance of this duty by the Governor was not essential to perfect the ratification.

As I see it, the question presented is substantial and of vast importance. I know of no method by which it can be adjudicated and determined whether the proposed amendment was in fact ratified which would be preferable to the particular case now before us. The question is raised, and in my opinion must be decided, and a decision cannot be escaped or avoided by reason of the fact that there is not enough in the record to enable us to determine the question presented for decision; nor is there too little matter in the record upon which to base a decision. The question turns at last on whether, as a matter of law, and properly a matter for judicial decision, votes returned according to law in 126 counties of the State shall be nullified by either the negligent or intentional sending of papers from 34 other counties which are not authenticated as required by law, not validated or vouched for by the superintendents, as ordained by law. In my opinion a paper unverified by the superintendents, a list of voters unsigned, an unsigned tally-sheet, on a paper entitled "Returns of sales of whisky," are none of them legal papers. As evidentiary documents, without names or signatures, only supposedly emanating from legal superintendents, each of them is a legal nullius filius. It will be a sad day for popular government when the certainty of our elections will depend upon guesswork, and sadder still when any kind of a fraud can be committed in an election that those who are in charge of the election are base enough to commit, without fear of prosecution. A criminal law without a penalty is little feared. The case sub judice differs greatly in its facts from the case of *Tanner* v. *Deen,* 108 *Ga.* 95 (supra). There an attempt was made to set aside the results in one of the precincts, because the return reached the court-house for consolidation a little after the prescribed hour of noon. But there was no attack upon the legality or the completeness of the return itself, as in the present case; and the case was properly decided, since it was brought by an impartial person upon whom no attack was made, and no question was raised as to his having tampered with the return itself.

In the opinion of the majority it is held that it is not now adjudicated "whether as a court, upon a record properly presenting the question, we would have jurisdiction to decide whether a proposed amendment to the constitution was ratified, without a declaration to that effect made by the officer clothed with the author-

ity under the law to make it." In my opinion this court has already held in the case of *Hammond* v. *Clark,* supra, that the jurisdiction of this court to decide whether a proposed amendment to the constitution has been ratified, whether any declaration to that effect has been made by the Governor, is undoubted; and the proposition is supported by numerous authorities. The court said: "The decision in *Combs* v. *State,* 81 *Ga.* 780 (8 S. E. 318), and that in *Woodward* v. *State,* 103 *Ga.* 496 (30 S. E. 522), are not controlling on the contention that the Governor's proclamation was conclusive. In each of these cases the legislature had passed a local-option law and provided a particular method for the declaration of the result. It is not necessary for us to consider how far the courts would go into the mere question of contesting the election or the number of votes cast, or whether they would go behind the consolidation by the Secretary of State. No such effort is made. . . It is also unnecessary to discuss the effect of lapse of time or acquiescence, or of the making of an amendment to the constitution effecting a radical change in the government. . . None of these things are here involved." Article 13, section 1, paragraph 1, of the constitution (Civil Code (1910), § 6610) reads as follows: "Any amendment or amendments to this Constitution may be proposed in the Senate or House of Representatives; and if the same shall be agreed to by two thirds of the members elected to each of the two houses, such proposed amendment or amendments shall be entered on their journals, with the yeas and nays taken thereon. And the General Assembly shall cause such amendment or amendments to be published in one or more newspapers in each Congressional district, for two months previous to the time of holding the next general election, and shall also provide for a submission of such proposed amendment or amendments to the people at said next general election; and if the people shall ratify such amendment or amendments by a majority of the electors qualified to vote for members of the General Assembly, voting thereon, such amendment or amendments shall become a part of this Constitution. When more than one amendment is submitted at the same time, they shall be so submitted as to enable the electors to vote on each amendment separately." It will be seen from the above that the constitution does not provide any proclamation of the Governor as an essential prerequisite to the passage of an

amendment to the constitution. The framers of the constitution evidently did not purpose for the will of a majority of those known to be qualified voters voting in favor of a constitutional amendment to be defeated merely because, as was said in *Hammond* v. *Clark,* supra, "such a proclamation may be both useful and proper in order to inform the people whether or not a change has been made in the fundamental law, but the constitution did not make it conclusive on that subject."

I am therefore of the opinion that the court cannot in the case now before us hold, as stated in the opinion of the majority, "that before a court could hold that the amendment had been ratified, it must appear that the Governor actually declared it ratified, unless the question of ratification or non-ratification is presented in this court in a record properly raising the question for judicial determination." What will constitute a record properly raising this question? It is said in the opinion of the majority: "that would involve, along with the presentation of the question, a proper exhibit of all the facts necessary for its determination." The majority asserts: "that is not done in this case." It is upon that point that I differ with the majority. If it be conceded, as I think it must be, that the Secretary of State is presumed to have examined all of the returns of all of the counties (and that he must have done this is apparent from his statement of the total vote of the State, exclusive of the counties whose returns were not certified as required by law), if he examined the returns of all the counties and, upon examining the returns of thirty-four of them, stated the exact facts as to what these returns disclosed, then all the facts are exhibited which are necessary for us to determine the question which the Secretary of State, as a merely ministerial officer, could not decide, and which the Governor would not undertake to decide; and therefore we have before us every fact that can be ascertained to enable us to reach a conclusion upon the question presented. Then the question resolves itself purely into one of law, as hereinbefore stated, and the failure on the part of this court to make a decision cannot be based upon the lack of a proper "exhibit of all the facts necessary for its determination." In fact, the opinion of the majority proceeds finally to admit impliedly that there is a record properly raising the question; for the opinion proceeds to rule that the "consolidated returns of counties should

not have been thrown out for irregularities and merely because the returns were not accompanied by all. the papers required by law, and because the papers were not certified in accordance with the statute directing how they shall be certified."

It may be insisted that the proper remedy is to be found in the writ of mandamus, by which the declaration of the result can be compelled. As hereinbefore stated, it is perfectly plain that the Secretary of State has already ascertained the result to be a majority of 1,848 in favor of the adoption of the proposed amendment. Neither the statements nor the conclusions of the Secretary of State are open to conjecture or subject to misunderstanding. Properly construing, as he did, the act of 1922 (Acts 1922, p. 28), the Secretary of State properly held that his duty was merely ministerial and that he could not declare the amendment carried, and could only declare, as he did, the "result," so that nothing remained to be done except the issuance of the proclamation by the Governor, as required by the aforementioned act. The Governor has not issued any proclamation, and it is said that for this reason if no other the amendment was not adopted. We have already quoted from *Hammond* v. *Clark,* supra, the ruling of this court in that case to the effect that whether or not an amendment to the constitution has been adopted is ultimately a matter of judicial determination; and whether the further ruling that this is true without regard to any proclamation of the Governor is obiter or not, it is, in my opinion, sound law. Otherwise, if in any case any constitutional amendment, no matter how important, were submitted to the people with a provision that the Governor should issue a proclamation and declare whether the amendment had been ratified or not, and any Governor should fail or refuse to issue such proclamation, the amendment would be defeated although it should have received the practically unanimous approval of the people at the polls; for the Governor is not subject to the writ of mandamus. It was held by Judge Warner in the case of *Lowe* v. *Towns,* 8 *Ga.* 360, that under our form of democracy with the distinct, separate and independent operation of the independent branches of the government, legislative, judicial, and executive, from political reasons, if no other, the Governor of the State could not be subjected to mandamus. He points out in this decision that unlike England, where the courts are the king's courts and the judges his judges,

and where the monarch cannot refuse to respond to the petition of his subject addressed really to him through his courts, in this country where the courts are not the courts of the king or the government, but one of the three independent, co-ordinate branches of the government, and the Governor the head of a separate, independent branch, mandamus will not lie. Adopted no doubt from the expressions of Judge Warner uttered in 1850, there was incorporated in the Code of 1861 the provision that the Governor should not be subject either to writ of mandamus or of prohibition,—the one ordering him to do and the other ordering him not to do any specified act in the discharge of his public duties. Every code since that time has contained the same provision, which is now found in § 5450 of the Code of 1910, to wit: "Neither of these writs will lie to the duly inaugurated Governor of the State, but they do lie to all other executive or military officers." So I repeat that any reliance upon mandamus where the act to be performed by the Governor of this State might be essential to complete the adoption of an amendment to the constitution would be a vain hope and nugatory as a remedy, and would subject the adoption or defeat of any amendment to the constitution to the mere caprice of the incumbent of the executive chair, and permit the autocratic judgment of such an executive to defeat the popular will.

As I have heretofore stated, this opinion has no reference to his Excellency Governor Hardwick, because, seemingly entertaining the same view of the law as I do, he held, I think very properly, in this case, that the matter should be submitted to judicial determination for a distinct ruling on the legal question whether the counties which the Secretary of State said should be thrown out and disregarded should be thus treated in advance of the proclamation.