## 20955. KING et al. v. BOARD OF EDUCATION OF RICHMOND COUNTY.

564

DECIDED JANUARY 19, 1931.

*William H. Fleming, William M. Howard,* for plaintiffs in error.
*George Hains, solicitor-general, Hull, Barrett & Willingham, Pierce Brothers,* contra.

JENKINS, P. J.   1.   A petition by a solicitor-general to validate bonds must specifically set forth a strict compliance with the law relative to the service of the notice provided for by the Political Code (1910), § 445, the name of the district or political subdivision of the State seeking to issue the bonds, the amount of the bonds to be issued, for what purpose they are to be issued, what interest they are to bear, how much principal and interest is to be paid annually, and when they are to be fully paid.   The petition must show that an election was held by the district for the issuance of the bonds, and it must also specifically appear that the result of the election was prima facie in favor of their issuance.   Political Code (1910), § 446; *Smith* v. *Dublin,* 113 *Ga.* 833 (2) (39 S. E. 327); *Harrell* v. *Whigham,* 141 *Ga.* 322 (80 S. E. 1010).   It is incumbent upon the petitioner in such a proceeding to make out a prima facie case by proving each of the substantial and material allegations set

forth above as necessary allegations of the petition; and when this is done the burden is cast upon the defendant, or upon a proper party as intervenor, to set up and establish any other fact which by aliunde proof would render the election invalid. *Powell* v. *Consolidated School District No. 1,* 26 *Ga. App.* 135 (2) (105 S. E. 616).

2. In the instant case the election for bonds was called by the board of county commissioners of Richmond county, pursuant to an act of the General Assembly approved July 22, 1929 (Ga. L. 1929, p. 700), and at the election there was submitted to the voters of Richmond county the question of the issuance or non-issuance by the board of education of Richmond county of the bonds provided for by the act mentioned. The petition for validation shows a compliance with the provisions of the law set forth in the preceding division of the syllabus, and meets the requirements there stated; that the total number of voters qualified to vote in the election was 9,690; that 6,049 votes were cast in the election, of which number 5,786 were in favor of the issuance of the bonds and 263 were against the issuance of the bonds. The proof submitted by the petitioner substantiated the allegations of the petition, and the court did not err in overruling the motion of the intervenors to refuse to validate the bonds, but properly ruled that a prima facie case had been made, and that the burden was cast upon the intervenors to set up and establish any other fact that would render the election invalid.

3. The act of the General Assembly approved August 21, 1922 (Ga. L. 1922, p. 97; Michie's Code of 1926, § 138 (8) et seq.), known as the Australian ballot law, requires the ordinary, for each election, general or special, to provide *at each polling place* "a private room or rooms, a booth or booths, or an enclosure or enclosures, with such compartments therein as may be necessary to accommodate the persons qualified to vote at such polling place." This provision of the law does not constitute each room, booth, or enclosure provided at a polling place a separate voting precinct, so as to require three superintendents for each such voting booth or enclosure; and where at a city voting precinct the list of registered voters was divided according to the alphabet, and voters admitted to the booths designated by the letters of the alphabet assigned to it, a separate ballot-box being used for each such booth, all the ballot-boxes, and all the managers and clerks engaged in conduct-

ing the election being within the same enclosure, such an arrangement did not constitute each division a separate voting precinct so as to require three managers for each box, but three qualified persons could legally superintend the entire election at such precinct.

4. Where in such a case it appears from the evidence introduced in a contest over the validation of bonds voted upon in such election that at each city voting precinct there were at least three superintendents who were eligible, by being freeholders or justices of the peace, to hold the election, it can not be set aside as being void for lack of proper managers, although other persons, who were not freeholders or justices of the peace nor an ordinary, may also have acted as managers at such election. See, in this connection, *Collins* v. *Huff*, 63 *Ga.* 207; *Slate* v. *Mayor &c. of Blue Ridge*, 113 *Ga.* 646 (38 S. E. 977).

5. Where a petition to validate bonds to be issued by the county board of education of Richmond county, under an act of the General Assembly approved July 22, 1929 (Ga. L. 1929, p. 700), was filed by the solicitor-general, it was not necessary that the answer to such petition by the board of education, required by the Civil Code (1910), § 456, be sworn to by each member of the board, but the affidavit of one member of the board was sufficient. *Hutchinson* v. *Lowndes County*, 131 *Ga.* 637 (62 S. E. 1048). The motion to dismiss the answer, on the ground that the member of the board of education by whose affidavit it was verified was disqualified to act as such board member, by reason of his having accepted an appointment as supervisor of the census, amounted to a mere speaking demurrer, and was properly overruled.

6. Likewise, the motion to dismiss the answer filed by the board of county commissioners which called the election, on the ground that the answer was verified by only one member of the board, was properly overruled.

7. The court properly rejected two letters alleged to have been written by persons who participated in the management of the election, since such evidence amounted to mere hearsay. Moreover, the author of one of the letters was introduced as a witness, and testified substantially to the facts set forth by the letter; and the other letter was anonymous, and its execution was not proved except by testimony as to a declaration made by the reputed author.

8. "No election shall be defeated for non-compliance with the requirements of the law, if held at the proper time and place by persons qualified to hold them, if it is not shown that, by that non-compliance, the result is different from what it would have been had there been proper compliance." Political Code (1910), § 126; *Brumby* v. *Marietta,* 132 *Ga.* 408 (64 S. E. 321); *Houser* v. *Hartley,* 157 *Ga.* 137, 144 (120 S. E. 622). The word "qualified" relates to the eligibility of managers to serve, and not to qualification in the sense of taking an oath. *Jossey* v. *Speer,* 107 *Ga.* 828 (33 S. E. 718). Accordingly, in the instant case, the entire election could not be set aside because of irregularities in that the managers at some precincts were not properly sworn, or because persons not eligible to be managers participated in the holding of the election, or because the precinct returns were not properly signed by the election managers.

9. It is the general rule that when the result of an election in any precinct has been shown to be so tainted with fraud that the truth can not be deducible therefrom, the entire poll should be rejected (McCrary on Elections, p. 569); still, on the other hand, if the true result can be ascertained by eliminating the illegal votes, the election will be upheld. 20 C. J. 182, § 224. It is further a well-recognized rule that a fraud committed by the officers holding an election, or with their knowledge and connivance, stands upon a different footing from fraud committed by other persons, and that in such former case a wilful and deliberate fraud upon the ballot-box, perpetrated by the officers of the election, even though not sufficient to affect the result, may destroy the integrity of the returns made by the managers, so as to deprive them of their standing as prima facie proof of the result of the election, and so as to require additional evidence to establish the result. McCrary on Elections, pp. 574, 575. In the instant case there was proof of circumstances which might reasonably tend to indicate that ballots in favor of the issue of bonds were deposited in the ballot-boxes by the managers in the names of persons who did not appear at the polls and vote, but there was no direct proof of such wrongful and fraudulent practices on the part of the election managers themselves as would demand a finding that the election officials had themselves been guilty of fraud on their own part such as would impeach their returns and leave the proponents of the issue of

bonds without prima facie evidence of the result of the election. While there was indisputable proof that about 273 ballots were fraudulent in that they were cast in the names of persons who did not attend the election, there was no sort of conclusive proof that the managers connived at such fraudulent procedure; nor, under the rule just stated, could it be said as a matter of law that even if the circumstances had conclusively indicated that the managers were parties to the illegal, wrongful, and fraudulent procedure indicated, it would be impossible, under the wide latitude and extraordinary opportunity given contestants pending the lengthy and exhaustive hearing of the contest, to sift out and ascertain the illegal votes actually cast. Consequently, it can not be said as a matter of law either that the court was required to reject the election returns made by the managers as prima facie proof of the result of the election, or that, in the event such should be the finding of the court under the evidence submitted, the result of the election could not be ascertained under the proof and examination made on the trial of the contest. The record discloses that the judge of the superior court, upon motion of the intervenors, appointed commissioners to reopen the ballot boxes and recount the votes, with instructions to ascertain and report any and all irregularities or fraud that they might find to exist in the boxes, and that the commissioners thus appointed examined and recounted the ballots, and checked them with the voters' lists, and that the report returned by the commissioners disclosed no internal evidences of fraud, but that the recount thus made tallied with the return of the managers. It further appears that the hearing of the validation proceeding was continued from time to time, at the request of intervenors, over a period of about four months, and that opportunity was given to those opposing the validation of the bonds to hire examiners and canvassers to check over the names on the voters' lists for the purpose of determining whether those whose names appeared on the lists as having voted actually did vote in the election, and that as reports were made by such canvassers of persons who failed to vote in the election, they were summoned to appear as witnesses, and hearings had for the purpose of examining such witnesses. In view of all the evidence, it can not be said as a matter of law that the court was unauthorized to find that the true result of the election could be ascertained by eliminating the

illegal votes actually cast, and that, after eliminating all such illegal votes, the result still showed that a substantial majority of all the persons qualified to vote in the election had cast their ballots in favor of the issuance of the bonds, and that such majority constituted more than two thirds of all those voting at the election. Consequently, the judgment of the court validating and approving the bonds can not be set aside.

*Judgment affirmed.  Stephens and Bell, JJ., concur.*