## KING *et al.* v. BOARD OF EDUCATION OF RICHMOND COUNTY *et al.*

No. 8289. APRIL 14, 1932.

*William H. Fleming* and *William M. Howard,* for plaintiffs in error.

*George Hains,* solicitor-general, *Hull, Barrett & Willingham, Pierce Brothers,* and *John M. Graham,* contra.

The views of RUSSELL, C. J., and GILBERT and HINES, JJ., as expressed by RUSSELL, C. J., are as follows:

RUSSELL, C. J. · This case is one·of contest of an election, which arose upon a petition brought to validate an issue of $1,000,000 in bonds to be issued by Richmond County for school purposes. The · plaintiffs in error filed an intervention setting up that the return of the managers of the election, for reasons stated, did not truly report the result of the plebiscite, and for this reason the vote in favor of the issue of the bonds was not sufficient, and the proposed issue of bonds should not be validated. It was agreed that the trial judge, without a jury, should pass upon all issues of fact as well as law. At the conclusion of the trial the court passed an order adjudging that the bonds had received the requisite majority of votes to require the validation of the bonds. The intervenors carried the case by bill of exceptions to the Court of Appeals, where the judgment of the lower court was affirmed. The plaintiffs in error in due course filed in this court a petition for certiorari. In view of the gravity and importance of the questions involved in the litigation, the court saw fit to grant the writ of certiorari, and so the case is before us for review. The evidence in the trial was so voluminous that it will not be set forth in detail, though it· has been carefully considered.

In addition to many facts stated in the decision of the Court of Appeals (42 *Ga. App.* 563, 156 S. E. 710), others will be referred to in this opinion. Much has been said in argument as to the fact that the issue of bonds here involved is for school purposes. The education of our youth is a matter of deepest concern and paramount importance to every parent as well as to every well-wisher of his country. However, in a country governed by democratic ideals and dependent for its very existence upon the perpetuation of republican institutions in all their strength and purity, and where the taxpayers are to be subjected to extremely heavy burdens, it would seem that the election which creates or promotes the schools is primarily of vastly more importance than the support of any object which it is the duty of the government to promote. In an ideal democracy, pure elections are the mudsills on which the entire superstructure of good government must be built. If the foundations are based on sands or are laid in mire, the waters of popular indignation, falling like rain in a cloudburst, will under-

mine and sweep away the structure which has been foolishly based on foundations insecure and unstable.

In the trial in the superior court the learned judge properly went to extreme lengths in affording the parties litigant ample time and opportunity to produce evidence in support of their intervention. His conduct in this respect entitles him to the highest commendation. However, we are of the opinion that his judgment was error, and the judgment of the Court of Appeals in affirming the result of his conclusions was likewise erroneous. We think that one ingredient of this error arises from a misapprehension of the rule as to the burden of proof in cases of contested elections. It is well settled, of course, that the returns and consolidation of the managers in an election such as we have before us are taken prima facie to be true, and any one who wishes to pick a flaw of any kind in such returns must assume the burden of proof of rebutting the prima facie case made by the returns of the managers. But when evidence has been submitted by the contestant (intervenors in this case) which demands a finding that fraud has corrupted the election as well as the returns of the managers, and involved the result of the election in such doubt that no man can say what was the, actual result, the prima facie verity of the return of the managers is destroyed. Then the burden of proof is shifted; and unless the party who has apparently gained the election can rebut the showing made by the contestant, he will not be permitted to enjoy the benefits of the wrongs done in his favor merely because, through the instrumentality of the managers and others, he has succeeded in so concealing and obliterating his tracks that the exact result can not be ascertained. Substantially, the decision of the Court of Appeals, which the petitioners in certiorari seek to set aside, reverses the judgment of the trial judge upon the evidence, but affirms his judgment as a whole, upon the doctrine that the intervenors failed accurately to show a sufficient number of illegal votes to have been cast to change the result of the election declared by the managers. Cases have been cited in support of that well-recognized principle. If the decision in this case rested upon any one, and only one, of such defects as the failure to have proper managers at a precinct, or that they were not sworn, or to have managers who had not been selected by law, or failure to make an absolutely correct return, these requirements might be held to

be merely directory. As it was apparent in all of the cases cited that there was no appearance of fraudulent intent, but there appeared only innocent ignorance of the requirements of the law, they could well be held to be merely directory; and not having affected the result of the election they would be regarded as harmless. But in the consideration of the case the Court of Appeals, though referring to a far more important principle and one which we think is particularly applicable to the facts of this case, did not apply it. In plain language, this rule may be stated to be that in an election of any kind, where there are so many evidences of fraud that the actual result is left in such an impenetrable gloom of doubt that no man can say what would have been the result had the election been free from fraud, the election should be held void. If necessary, another election, in which the true result may perhaps be ascertained, should be held.

"Where an election board are found to have wilfully and deliberately committed a fraud, even though it affect a number of votes too small to change the result, it is sufficient to destroy all confidence in their official acts, and to put the party claiming anything under the election conducted by them to the proof of his votes by evidence other than the return." McCrary on Elections, 576. "While it is well settled that mere neglect to perform directory requirements of the law, or performance in a mistaken manner, where there is no bad faith, and no harm has accrued, will not justify the rejection of the entire poll, it is equally well settled that when the proceedings are so tarnished by fraudulent, negligent, or improper conduct on the part of the officer that the result of the election is rendered unreliable, the entire returns will be rejected and the parties left to make such proof as they may of the votes legally cast for them." Paine on Elections, 500, § 596. "Upon the rejection of the returns from an election precinct on the ground of fraud, the legal votes cast are not thereby invalidated, but it places upon the persons who claim to have received any benefit from them the burden of proving them." 20 C. J. 240, § 325 (b). "When the result in any precinct has been shown to be so tainted with fraud that the truth can not be deducible therefrom, then it should never be permitted to form a part of the canvass. The precedents, as well as the evident requirements of truth, not only sanction, but call for, the rejection of the entire poll when stamped

with the characteristics here shown." McCrary on Elections, § 569. "The safe rule probably is, that where an election board are found to have wilfully and deliberately committed a fraud, even though it affect a number of votes too small to change the result, it is sufficient to destroy all confidence in their official acts, and to put the party claiming anything under the election conducted by them to the proof of his votes by evidence other than the returns." Id. § 576. "Where in a particular precinct or precincts election officers have committed or permitted fraud of such a character and extent that the true result can not be ascertained with reasonable certainty, the entire returns from that precinct should be rejected." 20 C. J. § 227. "Upon the rejection of the returns from an election precinct on the ground of fraud the legal votes cast are not thereby invalidated, but it places upon the persons who claim to have received any benefit from them the burden of proving them." Id. § 325.

The testimony as to the commission of numerous frauds, as disclosed by the record, caused the burden to shift from the intervenors, and placed upon the opposite parties the burden of proving that the actual result of the election was in favor of the issuance of bonds, by other evidence than the returns of the managers, in precincts where frauds were indubitably committed either with the connivance and permission of the managers, or by their express directions. In Patton v. Coates, 41 Ark. 124, it was said: "There is a distinction, in the nature of things, between particular illegal votes which may be proved and exactly computed, and which certainly ought to be excluded, wherever cast, and the effects of fraudulent combinations, coercion, and intimidation. It can never be precisely estimated how far the latter extend. Fraud is secret, and timidity shrinks from observation. Their effects depend on moral perversions, nervous organizations, and constitutional idiosyncrasies. They can not be arithmetically computed. Awe is silent and undemonstrative. Peace may be abject as well as the result of satisfaction. Yet it can not be said that elections are 'free and equal' where fraudulent combinations for illegal voting override honest votes. . . It would be to encourage such things, as the ordinary machinery of political contests, to hold that they shall only avoid to the extent their influence can be computed. It seems clear that courts must abnegate the power of preserving the

freedom of elections, and abandon the polls to the violent and unscrupulous; or must take the ground, that wherever such practices or influences are shown to have prevailed, not slightly and in individual cases, but generally, and to the extent of rendering the result uncertain, the whole poll must be held for naught. The evils of an occasional success of a minority, if that should sometimes happen in the effort to sustain the fundamental principle of our government, would be but temporary; and in any case would be but slight in comparison with the subversion of free government, which would surely follow the continued practice of rendering the freedom of elections a mockery."

It has been held in numerous jurisdictions that the test for determining whether there has been such gross irregularity as will justify the rejection of the entire vote of an election district is the possibility of separating the illegal from the legal votes. Scholl v. Bell, 125 Ky. 777 (102 S. W. 248); Ford v. Hopkins, 141 Ky. 181 (132 S. W. 542); Clark v. Robinson, 159 Ky. 25 (166 S. W. 801); Allen v. Griffith, 160 Ky. 528 (169 S. W. 1003); Harrison v. Stroud, 129 Ky. 193 (33 Ky. L. R. 653, 110 S. W. 828, 16 Ann. Cas. 1050); Lloyd v. Sullivan, 9 Mont. 577 (24 Pac. 218); Daly v. Petroff, 10 Phila. 389; Matter of Barber, 10 Phila. 579. In a case in which it appears from all the evidence adduced, and where, as in this case, it is admitted that there is no possibility of separating the legal from the illegal votes, the election returns as a whole should be rejected. The return of the managers of an election is prima facie correct. Upon one who contests the result as declared by the managers of an election falls the burden of throwing such grave doubt upon the return as to impeach the absolute veracity which would otherwise attach to the return if it had not been attacked by such evidence. That an election and the return of the managers may be attacked for fraud is universally held. Proof of numerous frauds committed in the presence of the managers of an election, and especially where ballot-boxes are stuffed by the instructions of the managers, and this evidence is not disputed, would require a finding for the contestant, unless the contestee introduced some evidence to show that the legal votes could be separated from the illegal, or some testimony to rebut the evidences of fraud. Of course, in this civil proceeding, the evidence offered to support a charge of fraud need not be proved beyond all reasonable doubt, but only by a preponderance of the evidence.

One of the managers at the second ward, who signed the return, admitted, "When [the officers] were not busy recording the votes offered through the window, they were writing down a list of the voters on the voting-list; and I asked them if they did it alphabetically, and he said, 'No, they had sense enough to skip around and write these names down,' though nobody offered a ballot between the voters they wrote down on the list." In the fourth ward 200 more votes in favor of bonds were added to the list after the polls were closed, the names being written by a clerk under the immediate direction of the justice of the peace in charge of the election. These votes were added in response to a message from one of the higher-ups that the fourth ward must put the thing over, and that about 200 more votes were needed from that ward. Mrs. Shedd, one of the lady managers at the fourth ward at the third box comprising letters J to L, was excused after the ballots in her box had been counted and she had signed the sealing-slip; and she testified that there were less than 100 ballots in that box when she left the booth. The official return for that same box showed 154 ballots counted, thus showing that more than 54 ballots were fraudulently put into the box. Of the last sixteen names on the voting list in box Q to Z in the fourth ward, the evidence showed one dead, two could not be found, two admitted voting, and eleven denied that they had come to the polls at all. In the fifth ward in box 2, letters D to I, 353 votes were counted for bonds when the total registered applicable to that box were only 355, and seven of those were shown to have been dead at the time of the election. Of the last ten names on the voters' list in this ward, not one could be found who had voted, and 74 witnesses whose names had been voted were put on the stand, and they testified they did not go to the polls at all. In the seventh ward the name of Judge W. H. Barrett was voted, though he was holding court in Savannah at the time the election was going on. There was also voted in this ward the name of the widow of a former mayor of Augusta, although she had been living in Massachusetts and was not in Augusta at the time of the election. In the fourth ward it was shown that five names were voted twice, and six dead whites and eighteen dead negroes were voted.

In the opinion of the trial judge validating the bonds it is stated: "The truth of this case, as shown by the evidence, is this: that

the friends of bonds were organized and had at each polling precinct their checkers and friends on the outside of the voting booths, for the purpose of seeing to it that all friends of the bonds got to the polls and voted. No doubt many of the managers and clerks were also friendly to bonds. There is not the slightest evidence to show any fraud in the election on the part of the Board of Education of Richmond County, or the superintendent of schools, or the Board of Commissioners of Roads and Revenues of Richmond County. The afternoon newspaper, which was in favor of bonds, got out an early edition on the day of the election, in which appeared in large headlines, substantially, that the vote was light and on account of the apathy of voters it was doubtful whether the election for bonds would carry. This made the friends of bonds nervous, anxious, and active; so much so that in some instances it was shown that the names óf absent qualified voters were voted by other persons, and in other instances *the evidence shows that some of the managers deposited ballots in the names of absent qualified voters.* To that extent and in that way there was illegal or fraudulent voting; *that happened to some extent in each and every ward.* . . This case is simply one where persons on the outside, in some instances by permission and acquiescence of managers on the inside of the voting booth, deposited votes in the names of absent qualified voters; in some instances this was done by the managers themselves."

In elections a distinction must be drawn between fraud or illegal acts that are committed by persons outside of the polls and entirely disconnected with the conduct of the election, and frauds that are committed by the managers themselves and within the sacred precincts set apart by the law for the determination of the wishes of a majority of the voters as expressed by the ballots of those entitled to cast them. He who seeks to pollute an election from the outside is but an outlaw and is so recognized; but what shall be said of like conduct by one who undertakes to manage an election and to truly announce the result, and thus stands upon holy ground, clothed as it were in sacerdotal robes to pose at the very altar of liberty, while with an assassin's dirk he stabs liberty in the back? Applying to the facts of this case the well-recognized and fundamental principle of law to which I have referred, it appears from undisputed evidence that messages were sent to the

managers of three of the wards from outside sources as to the number of votes that would probably be needed, and the proof is undisputed that these orders were obeyed by the managers, and ballots by the hundred were put in the boxes and counted as having been legally voted, though many of the persons in whose names these ballots were cast were dead, and many of them did not go to the polls or cast a ballot. To apply the rule used by the Court of Appeals, and show that the rule of law is justifiable or even tolerable, it would only be necessary, in future elections, for enough fraudulent ballots to be deposited by the managers as having been cast by people who did not participate, and whose whereabouts or even existence perhaps could not be proved in a contest, to render the contestants absolutely helpless to protest against fraud that might be known to the entire community. Let us suppose a case in which the managers know that the election is going to be very close, with the probability that in the event of contest a few hundred votes may be thrown out. In such a case the only thing needed to render a contest futile would be for those in charge of the place to put into the ballot-boxes and count a sufficient number of names of persons who could not be found or were dead, and thus involve the election in such doubt that the court could well say, "This election may be fraudulent; we rather think it is; but you have not established by direct proof the existence of enough illegal votes to alter the result as claimed by the managers, which must be presumed prima facie to be correct."

I give this illustration as merely a case where the ballots might be destroyed by the managers, where the usual rule that the prima facie case arising from the return of the managers is not indisputably conclusive when there is undisputed evidence of palpable and intentional fraud. Illustrations are useless further than to present the point. Had the managers in this instance been less confident that they had deposited enough ballots of voters who did not vote, and had deposited a majority of 5000 instead of 937, they would only have rendered the cries of those who protested the result more similar to the cries of a drowning sailor to the surge which left him in a watery grave. No matter what may be the subject of the election, it is my deliberate opinion if our courts of justice turn a deaf ear to such appeals for clean and honest elections as are presented in the petition for certiorari in this case, no attempt to protect the palladium of

the people's liberty will be successful. We are taught that the prime object of judicial investigation is the ascertainment of the truth. There has been but one fact or truth delved from the mass of testimony in this case; and that is, those charged with holding the election have succeeded in involving the true result in such doubt that no man knows, or can ever know, what was the true result. This shatters the prima facie case ordinarily arising in favor of the return of the managers, which should arise and continue where the managers have honestly certified the returns, themselves ignorant that even the slightest fraud had been committed. I can not hold that the prima facie case remains when the proof is undenied that the managers themselves participated in the gravest and grossest fraud.

I express no opinion at this time as to a number of exceptions of minor importance, with regard to the admission of evidence or the rejection of certain letters which were written; because I am only asserting my right to protest against the disregard of the sound principle everywhere recognized, that the result of an election reeking with fraud on the part of those who hold it, of so unconscionable and abhorrent a nature as in this case, should be set aside in any court, whether of law or equity.

The views of BECK, P. J., and ATKINSON and HILL, JJ., as prepared by ATKINSON, J., are as follows: This case came to the Supreme Court on certiorari to the judgment of the Court of Appeals, affirming the judgment of the trial court, validating certain bonds to be issued by the Board of Education of Richmond County. The Court of Appeals stated the facts thus: "This was a contest over the validation of $1,000,000 of bonds to be issued by the County Board of Education of Richmond County, pursuant to an election provided for by an act of the General Assembly of Georgia, approved July 22, 1929 (Ga. L. 1929, p. 700). The election was held under the act of 1922, known as the Australian ballot law. There were 9690 persons qualified to vote in the election, and the result showed 5786 votes in favor of bonds and 263 votes against the bonds. A petition for validation was regularly filed by the solicitor-general, and answered by the board of education, and by the board of county commissioners, the election having been called by the latter board, and the election returns consolidated and the result declared by it. On the trial the petitioner introduced docu-

mentary evidence substantiating the allegations of the petition; and the bill of exceptions, after setting forth a brief of the documentary evidence, recites that 'inasmuch as no issue is made in this bill of exceptions as to the admissibility or contents of the above-mentioned fourteen documents, no further particulars concerning them are included here.' An intervention was filed by certain citizens who set forth that the election was illegal and void, because: (1) certain persons who were appointed and acted as election managers were not qualified by reason of being ordinaries, freeholders, or justices of the peace; and that certain persons acted as managers who were not qualified and were not designated as such by the Board of County Commissioners of Richmond County, it being set forth that the authority to appoint election managers is vested in said board, and that the board through its officers or employees appointed the managers; (2) because the election managers were not sworn as required by law; (3) because three voters' lists and tally-sheets were not kept at each precinct as required by law, and a copy of the lists of voters and tally-sheets for certain precincts were not delivered to the county commissioners; (4) because ballots in favor of bonds were put into the ballot-boxes in the names of persons who did not go to the polls at all and did not vote in the election, the names of such persons being entered on the voting lists. The intervention sets forth a partial list of persons in whose names it is alleged ballots were illegally cast, and further sets forth that on account of the inability of intervenors to obtain voters' lists from all the precincts, it is impossible to allege all the names of persons who did not vote but for whom ballots were placed in the ballot-boxes. The hearing of evidence on the validation proceeding was continued throughout a period of more than three months; the court permitted the ballot-boxes to be opened, and furnished to the intervenors the lists of voters which were not available to them at the time the original intervention was filed; the ballots were recounted, and the recount tallied with the original returns made by the election managers; the case was continued in order that the evidence might be transcribed for use in the argument, and, after argument, the court, on August 27, 1930 (the hearing having begun on April 12, 1930), entered judgment validating the bonds, filing the following written opinion, which we quote in full as a part of the statement of facts:

"'The election involved in this proceeding was held under an act of the legislature adopted July 22, 1929 (Acts 1929, p. 700). After due notice and advertisement, as required in all cases of local legislation, the date of the election was fixed and held on November 6, 1929, and it was provided that the election should be called and the result declared by the Board of Commissioners of Roads and Revenues of Richmond County. According to the consolidated returns made by the proper parties, the election for bonds carried by a majority of 941, more than enough provided by said act. To this consolidation and declaration of the result of the election an intervention was filed, asking that the bonds be not validated on the grounds set out in the intervention, chief among which are the following: (a) Intervenors allege that voters' lists and tally-sheets were delivered for the first and second wards, but none for the third, fourth, fifth, sixth, or seventh wards, "and the withholding of those records in those five wards made it impossible at this stage of the investigation to detect and expose all the fraudulent ballots put in the boxes in the name of absent voters." (b) "The particular system of fraud practiced was to put [ballots] into the ballot-boxes in the name of persons who did not go to the polls at all, and to enter their names on the voting lists, the better to conceal the fraud and to prevent detection." (c) "3d, 4th, 5th, 6th, and 7th. In these wards the voting lists were not delivered to the board of county commissioners, and for that reason the percentage of illegal votes can not be set out at this time." (d) "It is possible that copies of the missing voting lists are in the sealed ballot-boxes now in possession of the clerk of the court; and these intervenors will make suitable prayer to get copies of those lists for proper examination in order that they may ascertain the number or percentage of fraudulent votes in said wards; and when so ascertained they will amend this petition accordingly." (e) "Eliminating the fraudulent votes, the bonds did not receive the necessary majority of the registered voters." (f) "Petitioners further charge that the bonds did not receive sufficient legal votes to constitute a majority of the qualified voters, as required by law." (g) "Petitioners also charge that more than 25% of the 396 votes claimed to have been cast in favor of the bonds in the first ward were illegal, and more than 50% of the 391 votes claimed to have been cast in favor of bonds in the second

ward were illegal, and that at least 50% of the 4330 votes claimed to have been cast in favor of the bonds in the 3d, 4th, 5th, 6th, and 7th wards were illegal. But it is impossible for petitioners to ascertain with any degree of certainty what the exact number of illegal votes were cast in favor of bonds in these five wards, nor is it possible for them to identify the persons in those names the fraudulent votes were cast until petitioners can obtain access to the contents of the ballot-boxes now held in the custody of the clerk of this court under an order passed December 31, 1929." On the date fixed for the first hearing, the County Board of Education of Richmond County, Georgia, and the Board of Commissioners of Roads and Revenues of Richmond County, Georgia, proceeded and did make out a prima facie case for the validation of the bonds.

"'Where the duly elected managers of a municipal election held in the City of Atlanta, for the purpose of determining whether or not bonds should be issued for municipal purposes, submitted the consolidated returns to the mayor and general council of such city, 'and consolidated and the result declared,' showing that the election resulted in favor of bonds, such consolidation was prima facie correct; and the burden would be on the intervenor to show that the result was inaccurate and different from that submitted by the mayor and general council of the city, and the intervenor failed to carry that burden." *Brown* v. *City of Atlanta,* 152 *Ga.* 283 (4) [109 S. E. 666]. Whereupon the burden shifted to the intervenors to make out their charges, or so many of them as were necessary under the law to invalidate the bonds. Several technical objections were made by the intervenors, which were overruled, and the court fixed another date on which to hear evidence that should be adduced by intervenors. After intervenors had shown by the evidence that several illegal or fraudulent votes had been cast in the various wards, the court, by an appropriate order, appointed commissioners to open the ballot boxes and take therefrom the lists of voters and furnish them to intervenors for inspection, checking and canvassing, in order that they might determine, as far as possible, how many illegal or fraudulent votes had been cast. Counsel for intervenors were indefatigable in their work, and the evidence shows that they had hired examiners and canvassers to hunt down and discover the names of all the persons possible appearing on the voters' lists who had not voted in this election. From time

to time, as counsel and these checkers and canvassers discovered the names of persons who had not voted, they were subpœnaed to appear in court and a time fixed for the hearing of such evidence as should be produced, until ten such hearings were had, and this investigation covered a period of about four months. Finally, on motion of intervenors, the court appointed commissioners to again open the ballot boxes and count the votes cast, in order to determine if they tallied with the number of names on the voters' lists in said boxes; the order further provided that said commissioners find out, if they could, any other irregularities or fraud that they might find to exist in said boxes. The report of the commissioners so appointed for such purpose showed that the actual ballots cast tallied with the names on the voters' lists, and reported no other evidence of irregularities or fraud. Barring technicalities, intervenors seemed to recognize by their intervention that in order to vitiate an election of this character they must show that illegal or fraudulent votes were cast sufficient to change the result of the election, though they insist in their argument, if I understood it correctly, that where it was shown that illegal or fraudulent votes were cast, that that ipso facto vitiated the election, or put upon the plaintiff the duty and burden of showing the election was regular. Our Supreme Court and the courts of the land have not left me without a guide to follow in this character of cases. "One who intervenes and interposes an objection to the validation of bonds, which rests upon matters which do not appear in the pleadings, but are dependent for their existence upon aliunde evidence, carries the burden of introducing evidence to substantiate the truth of his allegations." *Epping* v. *Columbus,* 117 *Ga.* 263, 285 [43 S. E. 803]; *Spencer* v. *City of Clarkesville,* 129 *Ga.* 627 (3) [59 S. E. 274].

'The broadest latitude was given to intervenors to discover any fraud possible and the number of illegal or fraudulent votes cast, even to the point of admitting evidence of doubtful admissibility. The truth of this case, as shown by the evidence, is this: that the friends of bonds were organized and had at each polling precinct their checkers and friends on the outside of the voting booths, for the purpose of seeing to it that all friends of the bonds got to the polls and voted. No doubt many of the managers and clerks were also friendly to bonds. There is not the slightest evidence to show any fraud in the election on the part of the Board of Education of

Richmond County, or the superintendent of schools, or the Board of Commissioners of Roads and Revenues of Richmond County. The afternoon newspaper, which was in favor of bonds, got out an early edition on the day of the election, in which appeared in large headlines, substantially, that the vote was light and on account of the apathy of voters it was doubtful whether the election for bonds would carry. This made the friends of bonds nervous, anxious and active, so much so that in some instances it was shown that the names of absent qualified voters were voted by other persons, and in other instances the evidence shows that some of the managers deposited ballots in the names of absent qualified voters. To that extent and in that way there was illegal or fraudulent voting; that happened to some extent in each and every ward. In this case there was no stuffing of the ballot-box in the sense that there were more ballots put in the boxes than there were names on the voters' lists; there was no changing of names on ballots, or intimidation of voters, or shifting of ballots from one issue to another. This case is simply one where persons on the outside, in some instances by permission and acquiescence of managers on the inside of the voting booth, deposited votes in the names of absent qualified voters; in some instances this was done by the managers themselves. There being no organized effort against bonds, this course of conduct was easy, which can not be too deeply deplored or condemned. The evidence shows that 273 such votes were cast illegally or fraudulently, and many others, whose names intervenors no doubt suspected had been voted illegally, could not be served with subpœnas, for the reason that they had moved away or did not reside at the addresses given on the registry list. Such removal is possible under our permanent registration system. Under it, it is possible that a voter may have moved forty times since the date of his registration, or to have died and his name remain on the registry list. Many of the managers did not subscribe to the oath nor sign the returns, but this omission would not vitiate an election.

"'While the election law requires the appointment of two judges and one inspector for each voting precinct, such a provision is merely directory, and the fact that all precincts did not have their full quota of officers will not vitiate an election. The absence of some of the election officers during the receiving of ballots is not

such an irregularity as to affect the result of an election. While the law provides that all election officers shall take and subscribe to a certain oath, the failure of the officials to take such oath will not defeat an election. An election will not be declared illegal because the election officials were not duly chosen or qualified. The purpose of an election, whether for men or for measures such as the one before us, is to give effect to the voice of the people; and when the people have spoken, their verdict should not be disturbed by the courts, nor the election in which they have voiced it held void, unless it is clearly so." Murphy v. City of Spokane, [64 Wash. 681] 117 Pac. 476.

"'The official acts of an officer are not the less valid for his omission to take and file the oath, unless in cases where so specifically declared." Code of Georgia, § 277. "The validity of an election held at the proper time and place by qualified persons is not affected by their failure to take and subscribe the oath required by law, unless it appears that by reason of such failure the result of the election was different from what it would have been had the managers been duly sworn. The word 'qualified' as used in section 112 of the Political Code (now section 126 of the Code of 1910) relates exclusively to the eligibility of the managers to serve, and not to qualification in the sense of taking an oath." Jossey v. Speer, 107 Ga. 828 (3) [33 S. E. 718]. "Statutes giving direction as to the mode and manner of conducting elections will be construed by the courts as directory, unless a non-compliance with their terms is expressly declared to be fatal, or will change or render doubtful the result." 20 C. J. 181, § 223. There was one booth, with no partitions, in each ward. Each booth had openings for the convenience and accommodation of voters, and at each opening there was a box. It is contended by intervenors that there should have been at least three managers, who were freeholders, at each box. The act creating the Australian ballot system does not specifically provide that there shall be at each box three managers who shall be freeholders. The settled election law of the State, as embraced in section 81 of the Code, contemplates and provides that three freeholders "may superintend the election." The law requires at least three managers, who shall be freeholders or magistrates, at each precinct. Even though the law were otherwise and there should have been three managers who were free-

holders at each box, an election would not be nullified on that ground, unless it could be shown that by reason of such non-compliance the result of the election would have been otherwise. The fraud shown in this case consists in the casting of ballots by persons not authorized to do so, in the names of absent qualified voters. One side is pleased to call this "illegal or fraudulent voting"; the other "fraudulent voting." Whether in this case it be illegal or fraudulent voting or both, the rule under our law is the same. The election can not be declared void because of such fraud or illegal voting, unless the result of the election can not be reasonably ascertained. "If a contest is made on the ground that illegal votes were cast, the burden is on the contestant to show, not only that the votes were cast and that they were illegal, but that they were cast for contestee and that they were sufficient in number to change the result of the election." 20 C. J. 122, § 131.

"'While it is well settled that where enough illegal votes were cast at an election to change the result or leave it in doubt, the election is void, yet it is equally well settled that the result of an election will not be disturbed because of illegal votes received unless the aggregate of such votes would change the result. If the true result can be ascertained by eliminating the illegal votes, the election will be upheld." 20 C. J. 182, § 224. "If it can reasonably be done, the court should uphold the validity of the election and not set it aside for light and trivial cause; and where there has been fraud, intimidation, bribery, illegalities, and irregularities and the result of such sinister influence can be eliminated and the result clearly ascertained between the legal voters, it is the duty of the court to do so and to sustain the election, but if fraud, intimidation, bribery, irregularities, and illegalities are such that the court can not with reasonable certainty determine who has received a majority of the legal votes, the election should be set aside." Marilla v. Ratterman (Ky.), 273 S. W. 69, 74. "The exclusion, solely on account of color, of persons qualified and offering to vote at the late municipal election in that town, there being a sufficient number excluded to have altered the result of the election, rendered it void." Howell v. Pate, 119 Ga. 537 [46 S. E. 667]. In the case of Brown v. Atlanta [supra] the court adhered to the principle in the following language: "But assuming that all of the ten thousand registered females who voted, as

shown by the record, were registered and voted legally, still if all of these were deducted from the total number of registered voters, as shown by the record, viz., 27,070, this would leave 17,070 male registered voters. It appears from the record that the highest number of votes cast in favor of any issue of bonds was for public schools, viz., 21,633, and the smallest number cast for any issue of bonds was 21,194; and that the highest vote cast against any issue was 1034, and the smallest vote cast against any issue was 513. So the vote cast for each of the issues of bonds was above 21,000. Assuming, therefore, that all of the 10,000 females were disqualified, and that all voted for the bonds, deducting this number from the 21,000 votes cast for the various issues of bonds, this would leave 11,000 as voting for bonds out of the 17,070 registered male voters. Adding the highest number of votes cast against any issue of bonds, viz., 1034, to the number of votes cast for that issue, we have a total of 12,034 votes cast. The number of affirmative votes is therefore obviously more than two thirds of the qualified voters who voted at said election, as well as a majority of the qualified voters of such municipality. Therefore, even if the 10,000 female registered voters should be excluded, the result of the election is the same, the bonds having received the requisite constitutional majority. See, in this connection, Civil Code (1910), § 126." . . . The same rule was again followed by our Supreme Court in the case of *Cowart* v. *City of Waycross,* 159 *Ga.* 589 [126 *S. E.* 476], where it was held: "Even under the contentions of the plaintiffs in error, 1300 voters were legally registered, and it is not shown of the 1947 who voted how many and who were the illegal voters; and since 1297 votes would be sufficient to constitute the necessary two thirds of 1947 votes cast, it was not shown that all of these 1297 may not have come from the 1300 who were undoubtedly qualified to vote. So we conclude there was no error in the judgment of the lower court" in validating the bonds.

"'If it were conceded that persons desirous of having the issue of bonds authorized or opposing such issues acted in violation of the provisions of the charter of the City of Marietta, and made themselves subject to prosecution for a misdemeanor, that alone would not render the election void. The act provides punishment for disobedience of its provisions, but does not provide that the entire election shall be nullified thereby; nor would this follow, at

least·unless it were shown that the result would have been otherwise save for such conduct.   If it were held that a violation of the charter provisions by any person would of itself invalidate the entire election, this would put it in the power of any person who was opposed to the issuing of bonds to defeat the will of the qualified voters, lawfully expressed, by himself merely disobeying the law. Even a failure on the part of the managers to protest against such conduct, or to call upon proper authorities to suppress it, would not suffice to overturn the entire election, and defeat the will of the qualified voters, where it·did not appear that the result would have been otherwise had the directions of the statute been properly observed." *Brumby* v. *Marietta*, 132 *Ga.* 408, 411 [62 S. E. 341]. "In a proceeding to validate bonds, under the act of December 6, 1897 (Ga. L. 1897, p. 82; Civil Code (1910), § 445 et seq.), it is within the power and jurisdiction of the superior court, upon proper pleadings and sufficient evidence, to pass upon the validity of any votes cast ·in the election, and to eliminate such votes as are shown by the pleadings and the evidence to be illegal.   In the present case, wherein certain citizens intervened and objected to the issuance of the proposed bonds because the several voters who voted in favor of them were for specific reasons not qualified to participate in the election, a demurrer to the intervention, upon the ground that the court was without authority, under the law, to inquire into the validity of the votes cast in the elecion, was properly overruled." *Turk* v. *Royal*, 34 *Ga. App.* 717 [131 S. E. 119].

"'If it were the law that some person or persons could cast one or one hundred or any number of illegal or fraudulent votes and thereby defeat an election, it would be possible to defeat any election.   Suppose one or two managers in an election were against bonds, or any given officer in a race, and they felt that that issue or officer would carry or be elected, to defeat such an election all they would have to do would be to cast a few illegal or fraudulent votes and then come into court and ask that the election be declared void because of such illegal or fraudulent voting.   So that the rule in such cases, as declared by our courts and the courts of the land, is both reasonable and just.   It is the solemn duty of the court, under the law, to safeguard the votes of citizens honestly cast, as it is to eliminate those voting illegally or fraudulently.   The illegal votes cast in this case, as shown by the evidence, are 273.

Of course it is impossible to show accurately the very number of illegal or fraudulent votes cast. There were 641 subpœnas issued by intervenors. Of this number 139 were served personally, 291 were left at the most notorious places of abode. 211 were not found. 101 were duplicates of subpœnas previously issued. About 15 testified to matters other than voting. Substantially ten stated they voted and were excused by intervenors as having been subpœnaed by mistake, with perhaps no record in the case having been made of such excused witnesses. The names of 273 persons were shown to have been voted illegally. So then when this court throws out, as it does, the 273 illegal or fraudulent votes cast and then should throw out all suspected ballots indicated by the subpœnas issued, the election for bonds would still carry by practically 436 majority. Suppose the court should then, for good measure, throw out one, two, or three hundred ballots, to take care of those which might have been missed (which is unreasonable), still the election for bonds would carry by a good majority. Therefore, an order of validation is being entered in accordance with the terms of this opinion.' "

Upon these facts the Court of Appeals ruled as follows:

"1. A petition by a solicitor-general to validate bonds must specifically set forth a strict compliance with the law relative to the service of the notice provided for by the Political Code (1910), § 445, the name of the district or political subdivision of the State seeking to issue the bonds, the amount of the bonds to be issued, for what purpose they are to be issued, what interest they are to bear, how much principal and interest is to be paid annually, and when they are to be fully paid. The petition must show that an election was held by the district for the issuance of the bonds, and it must also specifically appear that the result of the election was prima facie in favor of their issuance. Political Code (1910), § 446; *Smith* v. *Dublin,* 113 *Ga.* 833 (2) (39 S. E. 327); *Harrell* v. *Whigham,* 141 *Ga.* 322 (80 S. E. 1010). It is incumbent upon the petitioner in such a proceeding to make out a prima facie case by proving each of the substantial and material allegations set forth above as necessary allegations of the petition; and when this is done the burden is cast upon the defendant, or upon a proper party as intervenor, to set up and establish any other fact which by aliunde proof would render the election invalid. *Powell* v. *Consolidated School District No. 1,* 26 *Ga. App.* 135 (2) (105 S. E. 616).

"2. In the instant case the election for bonds was called by the Board of County Commissioners of Richmond County, pursuant to an act of the General Assembly approved July 22, 1929 (Ga. L. 1929, p. 700), and at the election there was submitted to the voters of Richmond County the question of the issuance or non-issuance by the Board of Education of Richmond County of the bonds provided for by the act mentioned. The petition for validation shows a compliance with the provisions of the law set forth in the preceding division of the syllabus, and meets the requirements there stated; that the total number of voters qualified to vote in the election was 9690; that 6049 votes were cast in the election, of which number 5786 were in favor of the issuance of the bonds and 263 were against the issuance of the bonds. The proof submitted by the petitioner substantiated the allegations of the petition, and the court did not err in overruling the motion of the intervenors to refuse to validate the bonds, but properly ruled that a prima facie case had been made, and that the burden was cast upon the intervenors to set up and establish any other fact that would render the election invalid.

"3. The act of the General Assembly approved August 21, 1922 (Ga. L. 1922, p. 97; Michie's Code of 1926, § 138(8) et seq.), known as the Australian ballot law, requires the ordinary, for each election, general or special, to provide at each polling place 'a private room or rooms, a booth or booths, or an enclosure or enclosures, with such compartments therein as may be necessary to accommodate the persons qualified to vote at such polling place.' This provision of the law does not constitute each room, booth, or enclosure provided at a polling place a separate voting precinct, so as to require three superintendents for each such voting booth or enclosure; and where, at a city voting precinct, the list of registered voters was divided according to the alphabet, and voters admitted to the booths designated by the letters of the alphabet assigned to it, a separate ballot-box being used for each such booth, all the ballot-boxes and all the managers and clerks engaged in conducting the election being within the same enclosure, such an arrangement did not constitute each division a separate voting precinct so as to require three managers for each box, but three qualified persons could legally superintend the entire election at such precinct.

"4. Where in such a case it appears from the evidence introduced in a contest over the validation of bonds voted upon in such election that at each city voting precinct there were at least three superintendents who were eligible by being freeholders or justices of the peace to hold the election, it can not be set aside as being void for lack of proper managers, although other persons who were not freeholders or justices of the peace nor an ordinary may also have acted as managers at such election. See, in this connection, *Collins* v. *Huff*, 63 *Ga.* 207; *Slate* v. *Mayor &c. of Blue Ridge*, 113 *Ga.* 646 (38 S. E. 977).

"5. Where a petition to validate bonds to be issued by the County Board of Education of Richmond County, under an act of the General Assembly approved July 22, 1929 (Ga. L. 1929, p. 700), was filed by the solicitor-general, it was not necessary that the answer to such petition by the board of education, required by the Civil Code (1910), § 456, be sworn to by each member of the board, but the affidavit of one member of the board was sufficient. *Hutchinson* v. *Lowndes County*, 131 *Ga.* 637 (62 S. E. 1048). The motion to dismiss the answer on the ground that the member of the board of education by whose affidavit it was verified was disqualified to act as such board member, by reason of his having accepted an appointment as supervisor of the census, amounted to a mere speaking demurrer, and was properly overruled.

"6. Likewise, the motion to dismiss the answer filed by the board of county commissioners which called the election, on the ground that the answer was verified by only one member of the board, was properly overruled.

"7. The court properly rejected two letters alleged to have been written by persons who participated in the management of the election, since such evidence amounted to mere hearsay. Moreover, the author of one of the letters was introduced as a witness, and testified substantially to the facts set forth by the letter; and the other letter was anonymous, and its execution was not proved except by testimony as to a declaration made by the reputed author.

"8. 'No election shall be defeated for non-compliance with the requirements of the law, if held at the proper time and place by persons qualified to hold them, if it is not shown that, by that non-compliance, the result is different from what it would have

been had there been proper compliance.' Political Code (1910), § 126; *Brumby* v. *Marietta,* 132 *Ga.* 408 (64 S. E. 321); *Houser* v. *Hartley,* 157 *Ga.* 137, 144 (120 S. E. 622). The word 'qualified' relates to the eligibility of managers to serve, and not to qualification in the sense of taking an oath. *Jossey* v. *Speer,* 107 *Ga.* 828 (33 S. E. 718). Accordingly, in the instant case, the entire election could not be set aside because of irregularities in that the managers at some precincts were not properly sworn, or because persons not eligible to be managers participated in the holding of the election, or because the precinct returns were not properly signed by the election managers.

"9. It is the general rule that when the result of an election in any precinct has been shown to be so tainted with fraud that the truth can not be deducible therefrom, the entire poll should be rejected (McCrary on Elections, p. 569); still, on the other hand, if the true result can be ascertained by eliminating the illegal votes, the election will be upheld. 20 C. J. 182, § 224. It is further a well-recognized rule that a fraud committed by the officers holding an election, or with their knowledge and connivance, stands upon a different footing from fraud committed by other persons, and that in such former case a wilful and deliberate fraud upon the ballot-box, perpetrated by the officers of the election, even though not sufficient to affect the result, may destroy the integrity of the returns made by the managers, so as to deprive them of their standing as prima facie proof of the result of the election, and so as to require additional evidence to establish the result. McCrary on Elections, pp. 574, 575. In the instant case there was proof of circumstances which might reasonably tend to indicate that ballots in favor of the issue of bonds were deposited in the ballot-boxes by the managers in the names of persons who did not appear at the polls and vote, but there was no direct proof of such wrongful and fraudulent practices on the part of the election managers themselves, as would demand a finding that the election officials had themselves been guilty of fraud on their own part such as would impeach their returns and leave the proponents of the issue of bonds without prima facie evidence of the result of the election. While there was indisputable proof that about 273 ballots were fraudulent in that they were cast in the names of persons who did not attend the election, there was no sort

of conclusive proof that the managers connived at such fraudulent procedure; nor, under the rule just stated, could it be said as a matter of law that even if the circumstances had conclusively indicated that the managers were parties to the illegal, wrongful, and fraudulent procedure indicated, it would be impossible, under the wide latitude and extraordinary opportunity given contestants pending the lengthy and exhaustive hearing of the contest, to sift out and ascertain the illegal votes actually cast. Consequently, it can not be said as a matter of law, either that the court was required to reject the election returns made by the managers as prima facie proof of the result of the election, or that, in the event such should be the finding of the court under the evidence submitted, the result of the election could not be ascertained under the proof and examination made on the trial of the contest. The record discloses that the judge of the superior court, upon motion of the intervenors, appointed commissioners to reopen the ballot boxes and recount the votes, with instructions to ascertain and report any and all irregularities or fraud that they might find to exist in the boxes, and that the commissioners thus appointed examined and recounted the ballots, and checked them with the voters' lists, and that the report returned by the commissioners disclosed no internal evidence of fraud, but that the recount thus made tallied with the return of the managers. It further appears that the hearing of the validation proceeding was continued from time to time, at the request of intervenors, over a period of about four months, and that opportunity was given to those opposing the validation of the bonds to hire examiners and canvassers to check over the names on the voters' lists for the purpose of determining whether those whose names appeared on the lists as having voted actually did vote in the election, and that as reports were made by such canvassers of persons who failed to vote in the election, they were summoned to appear as witnesses, and hearings had for the purpose of examining such witnesses. In view of all the evidence, it can not be said as a matter of law that the court was unauthorized to find that the true result of the election could be ascertained by eliminating the illegal votes actually cast, and that, after eliminating all such illegal votes, the result still showed that a substantial majority of all the persons qualified to vote in the election had cast their ballots in favor of the issuance of the bonds, and that such majority constituted more

than two thirds of all those voting at the election. Consequently, the judgment of the court validating and approving the bonds can not be set aside."

The assignments of error in the petition for certiorari are upon various excerpts from the opinion of the Court of Appeals. In the opinion prepared by the Chief Justice of this court there does not seem to be disagreement as to principles of law stated by the Court of Appeals, but disagreement as to the results to follow from their application to the facts. The main insistence in that opinion is that the entire election should be set aside on the ground of fraud perpetrated by certain managers of the election in knowingly allowing persons to vote for bonds who were not qualified voters, and by allowing ballots for bonds in the names of persons who were absent or dead. This contention is very aptly met by the ruling in the tenth division of the opinion of the Court of Appeals, which need not be repeated. Moreover, the opinion prepared by the Chief Justice on this question is based entirely on authorities in other States, and seems to overlook the constitution and statutes of this State. In section 126 of the Civil Code it is stated: "No election shall be defeated for non-compliance with the requirements of the law, if held at the proper time and place by persons qualified to hold them, if it is not shown that, by that non-compliance, the result is different from what it would have been had there been proper compliance." In section 122 ample provision is made for opening the ballot-boxes and examination of any suspected ballots. In section 123 it is declared: "Illegal votes, by the method aforesaid and otherwise, may be proven by both parties, and if such are proven on both sides, one shall stand against another, and he is elected who has the greatest number of legal votes. All are considered legal not proven to be illegal." In the face of this statute and especially the words of the last sentence, "all are considered legal not proven to be illegal," it can not be held that fraud of the managers in allowing illegal votes for bonds would impose upon the petitioners for validation of the bonds the burden of proving affirmatively that the ballots cast for bonds were lawful. The constitution of this State, article 2, section 1, paragraph 2 (Civil Code, § 6396), as modified by the 19th amendment to the constitution of the United States, provides that "every . . citizen of this State who is a citizen of the United States, twenty-one years old

or upwards, not laboring under any of the disabilities named in this article, and possessing the qualifications provided by it, shall be an elector and entitled to register and vote at any election by the people; provided, that no soldier, sailor, or marine in the military or naval service of the United States shall acquire the rights of an elector by reason of being stationed on duty in this State." The words, "shall be an elector and entitled to register and vote at any election by the people," are unequivocal, and the entire provision amounts to a constitutional guaranty of the rights of suffrage, which, though subject to reasonable regulation, can not be absolutely denied or taken away. *Stewart* v. *Cartwright,* 156 *Ga.* 192, 197 (118 S. E. 859). This case should be viewed also from the angle of the lawful voter, and his vote for bonds should not be destroyed even if other votes for bonds are corruptly allowed by the managers of the election. That result would be accomplished in this case if, as contended by the Chief Justice, the entire election should be set aside. Moreover, such a result would enable corrupt managers of elections to prevent lawful voters from having their ballots counted in elections. It would bring about impossibility for the Board of Education of Richmond County to obtain the benefits of the statute authorizing the issuance of bonds. This was in the mind of the able trial judge when he said: "If it were the law that some person or persons could cast one or one hundred or any number of illegal or fraudulent votes and thereby defeat an election, it would be possible to defeat any election. Suppose one or two managers in an election were against bonds, or any given officer in a race, and they felt that that issue or officer would carry or be elected, to defeat such an election all they would have to do would be to cast a few illegal or fraudulent votes and then come into court and ask that the election be declared void because of such illegal or fraudulent voting. So that the rule in such cases, as declared by our courts and the courts of the land, is both reasonable and just. It is the solemn duty of the court, under the law, to safeguard the votes of citizens honestly cast, as it is to eliminate those voting illegally or fraudulently." In this case the superior court had power to enquire into all the facts, and did allow the election returns and even the ballot-boxes to be opened, and the ballots to be examined and counted, and did allow the intervenors every opportunity to show unlawfulness of the votes upon any ground.

A certain number of votes (273) were found to be unlawful; but after elimination of these and the possibility of others (which were not shown to be unlawful) in a manner as pointed out by this court in *Brown* v. *Atlanta,* 152 *Ga.* 283(4) (supra), it was found that the requisite majority of lawful votes were cast for bonds, and the application for validation was granted. The Court of Appeals reached the correct conclusion, and the judgment should be affirmed.